647 So.2d 351 (1994)
Donna M. THIBODEAUX (Pfeifer)
v.
USAA CASUALTY INSURANCE COMPANY.
No. 93 CA 2238.
Court of Appeal of Louisiana, First Circuit.
November 10, 1994.
Rehearing Denied December 28, 1994.
*353 Jay J. Luke, Houma, for appellant Donna M. Thibodeaux (Pfeifer).
Timothy G. Schafer, Lafayette, for appellee USAA Cas. Ins. Co.
*354 Before LOTTINGER, C.J., and CARTER and PITCHER, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in an action for damages.

FACTS
On July 20, 1991, Donna Thibodeaux, a registered nurse, was driving in the left northbound lane of Tunnel Boulevard in Houma, Louisiana.[1] As she approached the intersection of Tunnel Boulevard and Hollywood Road, Thibodeaux entered the left turn lane to turn onto Hollywood Road. Upon entering the turn lane, Thibodeaux collided with a vehicle which was crossing the turn lane in an effort to get into the southbound lane of Tunnel Boulevard. The vehicle crossing the turn lane was being driven by Trevor Whitten. As a result of the accident, Thibodeaux allegedly sustained serious injuries.
On July 13, 1992, Thibodeaux (plaintiff) filed an action for damages against USAA Casualty Insurance Company (USAA), her umbrella uninsured/underinsured motorist (UM) carrier. On August 9, 10, and 11, 1993, the matter was tried before a jury. During the trial, out of the presence of the jury, the parties stipulated that plaintiff had previously received the following amounts:
(1) $10,000.00 policy limits from Whitten's primary liability insurer, Colonial Lloyd's;
(2) $100,000.00 policy limits from State Farm Mutual Automobile Insurance Company, plaintiff's primary UM carrier;
(3) $2,500.00 medical payments coverage from State Farm Mutual Automobile Insurance Company; and
(4) $25,000.00 unconditional tender from USAA.
On August 11, 1993, the jury returned a verdict, assessing 75% of the fault to Whitten and 25% to plaintiff. The jury also found that the accident either caused or aggravated plaintiff's injuries and awarded her the following damages:

(1) Past, present, and future mental
 anguish and physical pain
 and suffering $ 5,000.00
(2) Past medical (stipulated) 19,078.61
(3) Future medical 2,000.00
(4) Past lost wages 11,534.00
(5) Loss of future earning capacity 90,000.00
(6) Permanent disability 5,000.00
(7) Loss of fringe benefits 0.00
 ___________
 Total $132,612.61

Based on the jury verdict and the stipulation, the trial court awarded plaintiff $99,459.46, which is 75% of the jury verdict, subject to a credit of $137,500.00 already received by plaintiff. The court then assessed costs to USAA.
Plaintiff had also requested penalties and attorney's fees against USAA for its alleged failure to tender an adequate amount. Based on the jury's verdict, however, the trial court found that USAA was not liable to plaintiff for penalties and attorney's fees.
Plaintiff appealed from the trial court judgment, assigning the following specifications of error:
(1) The jury abused its discretion in assessing plaintiff with 25% of the fault.
(2) The jury abused its discretion in awarding plaintiff only $5,000.00 for past, present, and future mental anguish and physical pain and suffering.
(3) The jury abused its discretion in awarding plaintiff only $11,534.00 for past lost wages.
(4) The jury abused its discretion in awarding plaintiff only $90,000.00 for loss of future earning capacity.
(5) The jury abused its discretion in awarding plaintiff only $5,000.00 for permanent disability to the body.
(6) The jury abused its discretion in failing to award plaintiff damages for loss of fringe benefits.
(7) The trial judge erred in failing to award penalties and attorney's fees against USAA.
*355 USAA answered the appeal, contending that the trial court erred in assessing USAA with court costs.

COMPARATIVE NEGLIGENCE
Plaintiff contends that the jury abused its discretion in assessing her with 25% of the fault.
It is well settled that the allocation of comparative negligence is a factual matter within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 840 (La. App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993). For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.
The Louisiana Supreme Court, in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), set forth guidelines for apportioning fault under the doctrine of comparative negligence. The court stated the following:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the casual relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, the court listed various factors which may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty and Insurance Co., 469 So.2d at 974.
In the instant case, Trevor Whitten testified that, just prior to the accident, the signal light at the intersection of Tunnel Boulevard and Hollywood Road was red for the two northbound lanes of Tunnel Boulevard and that there was a line of traffic stopped in each of the two northbound lanes. Whitten stated that he was leaving the driveway of a convenience store on the east side of Tunnel Boulevard and that he wanted to cross the two northbound lanes to proceed south on Tunnel Boulevard. According to Whitten, two vehicles allowed space for him to cross the two northbound lanes so he proceeded to cross the lanes at a speed of approximately five miles per hour. Whitten testified that, when he entered the left northbound lane, there was a white truck stopped to his left, which was blocking his view of the left turn lane. According to Whitten, he stopped in front of the truck and then inched forward to a point which was approximately six feet into the left turn lane, where he again stopped. Whitten stated that, because he saw no vehicles approaching in the left turn lane, he moved forward approximately four feet toward the left southbound lane of Tunnel Boulevard. His vehicle was then *356 struck on the driver's side door by plaintiff's vehicle.
Sheryl Griffen testified that she witnessed the accident. She stated that the signal was red for both northbound lanes of Tunnel Boulevard and that she was in her van stopped in the left northbound lane of Tunnel Boulevard. Griffen explained that there was a small car immediately in front of her and a large white truck immediately in front of the small car. To Griffen's right were the right northbound lane and a right turn lane. To her left was the left turn lane. Griffen testified that Whitten was exiting the parking lot of a convenience store adjacent to the right turn lane and that she watched as he "creeped" across the right turn lane and the two northbound lanes. She stated that Whitten stopped in the left northbound lane in front of the large white truck and that she then noticed the front end of Whitten's vehicle go forward into the left turn lane. At that time, Griffen noticed plaintiff's vehicle, which was immediately behind her, move into the left turn lane. According to Griffen, there were at least three car lengths between plaintiff's vehicle and Whitten's vehicle at that time. Griffen indicated that, when plaintiff passed her, she was accelerating up to approximately twenty miles per hour and looking at the turn signal which was still green. Griffen estimated that it was a matter of seconds from the time that plaintiff pulled into the left turn lane until the accident occurred. Griffen noted that there was nothing to obstruct plaintiff's view of Whitten's vehicle and that plaintiff hit Whitten's vehicle broadside.
Plaintiff testified that she was thirty-seven years old at the time of trial. On the day of the accident, she was travelling in the left northbound lane of Tunnel Boulevard and began to slow down because traffic ahead was beginning to "stack up" at the intersection. Plaintiff did not recall what the traffic signals were for the two northbound lanes, but she recalled that the traffic was stopped at the light and that there were a few cars ahead of her. As plaintiff moved into the left turn lane, Whitten's vehicle "darted out" in front of her, and she slammed on her brakes.[2] Plaintiff testified that she did not see Whitten's vehicle before she changed lanes and that, when she noticed Whitten's vehicle, it was directly in front of her. Although plaintiff could not recall whether the left turn arrow was green when she entered the turn lane, she remembered looking up at the light.
A review of the above testimony indicates that the jury could have found that plaintiff was inattentive with regard to the traffic conditions and was not keeping a proper lookout and that such conduct caused or contributed to the accident. Therefore, we conclude that a reasonable basis exists in the record for the jury's assessment of 25% of the fault to plaintiff. Accordingly, the assessment of fault is not manifestly erroneous.

PAIN AND SUFFERING AND DISABILITY
Plaintiff contends that the jury abused its discretion in awarding her damages of only $5,000.00 for pain and suffering and $5,000.00 for permanent disability.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App.1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the injured party in as near a fashion as possible to the state she was in at the time immediately preceding injury. McCray v. Abraham, 550 So.2d 244, 248 (La.App.4th Cir. 1989). It is well settled in our jurisprudence that a tortfeasor takes his victim as he finds her. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); McCray v. Abraham, 550 So.2d at 247. When a defendant's negligent conduct aggravates a preexisting condition, the victim must be compensated for the full extent of the aggravation. Miley v. Landry, 582 So.2d 833, 837 (La.1991); Epps v. City of *357 Baton Rouge, 604 So.2d 1336, 1345 (La. App.1st Cir.1992). The factors to be considered in assessing quantum for pain and suffering are severity and duration. Glasper v. Henry, 589 So.2d 1173, 1180 (La.App.4th Cir. 1991), writ denied, 594 So.2d 1315 (La.1992); Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1186 (La.App.1st Cir.1985), writ denied, 480 So.2d 743 (La.1986).
Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. LSA-C.C. art. 2324.1; American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d at 433; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976); Callender v. Delchamps, Inc., 542 So.2d 140, 144 (La.App.1st Cir.1989). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Recently in Youn v. Maritime Overseas Corp. et al., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted that:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In reviewing an award of damages, an appellate court should not rely on a comparison of other awards in other cases to determine if a particular award is appropriate. A comparative analysis should be undertaken only after the appellate court has found an abuse of discretion. In Youn v. Maritime Overseas Corporation, 623 So.2d at 1260, citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the court stated:
Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.
In the instant case, the testimony and medical records reveal the following:
Dr. Donald Joseph Judice, a neurosurgeon, testified that he first saw plaintiff on May 3, 1988, at which time she had complaints of neck pain and numbness in her lower arms. In giving her history to Dr. Judice, plaintiff stated that she hurt her neck by jumping into a moving car, which her young son had put into gear. An MRI revealed that plaintiff had a bulging and/or herniated disc at C-5-6. Dr. Judice treated plaintiff conservatively with exercise, physical therapy, and medication, and he felt that she responded well to the treatment. According to Dr. Judice, plaintiff returned to see him on January 29, 1990, with complaints of occasional neck and arm pain. A neurological examination revealed normal results, and Dr. Judice advised plaintiff to return on an as-needed basis.
The next time Dr. Judice saw plaintiff was on August 12, 1991, after the accident at issue herein. Plaintiff complained of persistent neck pain, headaches, and right arm pain and indicated to Dr. Judice that, prior to the accident, she was not experiencing pain on a regular basis. An examination revealed a limited range of motion in plaintiff's neck and a right paraspinous muscle spasm. Dr. Judice noted that, in previous examinations, plaintiff had not experienced muscle spasms. Dr. Judice explained that muscle spasms are caused by injury to the spinal cord, a nerve root, or the muscle itself, and he opined that plaintiff's nerve root had been irritated in the accident. Dr. Judice treated plaintiff with muscle relaxants and physical therapy for a couple of weeks, but the treatment was unsuccessful.
Dr. Judice continued to see plaintiff, and by October 15, 1991, plaintiff had a significant increase in pain. Dr. Judice's examination *358 revealed normal results, but he opined that the C-5-6 disc bulge was pinching the right C-6 nerve root, causing plaintiff to experience pain. Dr. Judice continued treating plaintiff with physical therapy including the use of heat, traction, ultrasound, and massage.
On October 22, 1991, plaintiff indicated to Dr. Judice that she could no longer handle the pain. Dr. Judice, therefore, admitted her into the hospital for a confirmatory myelogram and CT scan. Dr. Judice stated that the tests confirmed the previous MRI findings of a bulging disc at C-5-6. Therefore, Dr. Judice recommended that plaintiff undergo a microscopic anterior cervical disc removal and fusion, which was subsequently performed on November 5, 1991, with good results.
On November 18, 1991, Dr. Judice saw plaintiff, but no complaints were noted. Plaintiff told Dr. Judice that she was being active and was not experiencing neck or arm pain. Dr. Judice then advised plaintiff to return in one month, which she did in December of 1991. At that time, plaintiff's only complaint was neck soreness, so Dr. Judice put her on an exercise program and allowed her to return to work with the restrictions that she not pick up more than twenty pounds, not bend, stoop, or crawl repetitively, and not go up and down stairs repetitively.
According to Dr. Judice, plaintiff seemed to be progressing well. On January 28, 1992, he noted that plaintiff was asymptomatic. On April 7, 1992, Dr. Judice again saw plaintiff and noted that she had no problems and no complaints.
On November 5, 1992, however, plaintiff returned to Dr. Judice with stabbing pains in the back of her neck. An examination of plaintiff revealed a right paraspinous muscle spasm. Dr. Judice ordered an MRI, which revealed no recurrent or new disc protrusion. Dr. Judice opined that plaintiff was experiencing "overuse syndrome" and explained that she was stressing herself with full-floor nursing. Therefore, Dr. Judice ordered that plaintiff not return to work.
On December 1, 1992, Dr. Judice saw plaintiff, and she informed him that she had attempted to return to work but experienced a recurrence of her symptoms. Dr. Judice suggested that plaintiff refrain from working as a clinical or bedside nurse. On January 14, 1993, plaintiff had complaints of occasional right arm pain. Dr. Judice opined that the pain was caused by nerve root irritation, which was related to the overuse syndrome and the surgery.
Dr. Judice assigned plaintiff a total body disability of 15%. However, Dr. Judice stated that he does not expect plaintiff to require future medical treatment as a result of the accident. Dr. Judice acknowledged that plaintiff's inability to perform a head nurse's job and a staff nurse's job is a result of the July 20, 1991, accident. According to Dr. Judice, plaintiff is able to perform the duties required of her by Golden Age Home Care within the recommended restrictions.
On May 14, 1993, Dr. James Williams, orthopedic surgeon, saw plaintiff for evaluation purposes only. He found a restriction of neck motion, but did not find any spasms or other problems. Dr. Williams recommended that plaintiff refrain from frequent, repetitive, or heavy lifting, bending, stooping, climbing, and working with arms overhead. Dr. Williams stated that plaintiff can work as a registered nurse as long as she works within these restrictions.
Dr. Williams testified that he reviewed plaintiff's MRI images from 1988 and 1991 and indicated that there was a C-5-6 disc bulge in both images and that the bulge had not greatly increased in size between 1988 and 1991. However, he noted that it was difficult to compare the images because different imaging techniques had been used, resulting in a difference in the size of the image generated.
Dr. Williams concurred with Dr. Judice's 15% total body disability rating and his recommended physical restrictions. Dr. Williams stated that, based on the history that plaintiff gave him, he felt that the automobile accident aggravated plaintiff's degenerative disc problem, making it symptomatic.
*359 Plaintiff testified that, in 1988, she injured her neck by jumping into a moving car, which her young son had put into gear. At that time, her nursing duties included bedside care for a medical/surgical/pediatric unit, caring for infants and adults. Plaintiff stated that she did not experience neck problems again until January of 1990.
In April or May of 1990, plaintiff became a staff nurse for a cardiac care unit, where she remained until October of 1991. Plaintiff testified that, after the November 5, 1991, surgery, she felt better, but had occasional headaches and muscle spasms in her neck. Plaintiff stated that she returned to work on January 22, 1992, taking a head nurse position and did not again experience problems until May of 1992. Plaintiff explained that, during the month of May, the hospital was short-staffed, requiring her to work extra hours. Her symptoms during that period included headaches, neck pain, arm pain, and occasional pressure down her leg. Plaintiff stated that working with the patients caused her to experience increased pain.
Plaintiff worked in the head nurse position until November 26, 1992, at which time she felt that she could no longer perform her duties as head nurse or as a staff registered nurse. Therefore, she resigned from her head nurse position with Terrebonne General Medical Center. Between November of 1992 and April of 1993, plaintiff experienced headaches, neck cramping, and pain in her arms, having good and bad days. Plaintiff could no longer perform household chores and was forced to reassign the chores to her children and husband.
In April of 1993, plaintiff became employed with Golden Age Home Care as a contract nurse, working part-time, and, eventually, became care coordinator on a full-time basis.[3] Because of her permanent restrictions, plaintiff cannot perform nursing duties involving direct patient care and will never be able to return to her previous positions as a staff or head nurse. Up until the time of trial, plaintiff was on medication and using infrassage, heating pads, and tub soaks to provide temporary relief for the pain she experiences.
David Pfeifer, plaintiff's husband, testified that, after the accident, his wife had neck pain, headaches, and had trouble getting up for work. He also stated that she could no longer do the things that she did before the accident, such as playing baseball and basketball with the children, helping with yard work, and cooking. David indicated that his wife experienced less pain after the surgery. However, he testified that, during the period of May through November of 1992, it was very difficult for his wife to perform her duties as head nurse.
After hearing all of the evidence, the jury awarded plaintiff damages of only $5,000.00 for pain and suffering and $5,000.00 for permanent disability. Although the jury interrogatories indicate that the July 1991 accident either caused or aggravated plaintiff's injuries, the jury apparently determined that not all of plaintiff's complaints were causally related to the 1991 accident. Accordingly to Dr. Judice's testimony, plaintiff was asymptomatic for nearly eleven months, from January of 1992 to November of 1992, before she began experiencing difficulties again. Moreover, although plaintiff's testimony and that of her husband's revealed that plaintiff experienced a recurrence of her symptoms in May of 1992, the evidence also demonstrated that plaintiff did not seek medical attention for the alleged recurrence of her symptoms. In making the awards for pain and suffering and permanent disability, the jury apparently made a credibility determination based upon this conflict in the testimony between the medical experts and plaintiff and her spouse. Based on this determination, the jury apparently attributed plaintiff's problems for the six-month period following the accident (July 1991 through January of 1992) to the July 1991 accident and awarded plaintiff damages for that six-month period only. Similarly, the jury apparently concluded that plaintiff's more recent complaints, which began in November of 1992 and caused plaintiff to subsequently resign from her position at Terrebonne General Medical Center, were not attributable to the July 1991 accident.
*360 We have thoroughly reviewed the entire record in this matter. And, although we might have awarded greater damages had we been sitting as the trier of fact in this case, we cannot say that the jury abused its much discretion in making these awards.

PAST LOST EARNINGS
Plaintiff contends that the jury erred in awarding her only $11,534.00 for past lost earnings.
It is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident. ANMAC Foundation, Inc. v. St. Patrick Hospital of Lake Charles, 594 So.2d 951 (La. App. 3rd Cir.1992). Past lost earnings are susceptible of mathematical calculation from proof offered at trial, and an award for this element of damages is not subject to the much discretion rule. Ammons v. St. Paul Fire and Marine Insurance Company, 525 So.2d 60, 65 (La.App. 3rd Cir.), writ denied, 525 So.2d 1045 (La.1988).
In the instant case, Dr. Randy Rice, an expert economist, testified that, in his estimation, plaintiff's past lost wages totalled $38,693.00. In reaching this figure, Dr. Rice stated that, on November 3, 1991, when plaintiff stopped working, she had a monthly income of $4,300.09 and that, when plaintiff returned to work in January of 1992 as head nurse, her monthly income was $4,945.00. Dr. Rice then determined that, had plaintiff worked continuously from November of 1991 until the date of trial, she would have earned $103,165.00. Dr. Rice then looked at plaintiff's actual earnings for that time period and determined that she had earned $64,467.00. Dr. Rice then subtracted plaintiff's actual earnings ($64,467.00) from the amount that she would have earned had she worked continuously ($103,165.00), and he obtained the figure for past lost earnings, $38,693.00.
On cross-examination, Dr. Rice stated that plaintiff's lost earnings for the period of November 3, 1991, through January 22, 1992, when plaintiff was not working, totalled $11,310.00. Dr. Rice then acknowledged that from January of 1992 until November of 1992, plaintiff worked regularly. Dr. Rice admitted that, in estimating plaintiff's past lost earnings, he made no determination as to the reason that plaintiff stopped working at Terrebonne General Medical Center in November of 1992. Rather, he based his estimate on the assumption that plaintiff resigned from her job with Terrebonne General Medical Center due to a condition caused by the accident involved herein.
After considering Dr. Rice's testimony along with all of the other evidence, the jury awarded plaintiff $11,534.00 for past lost earnings. Apparently, the jury found that plaintiff failed to prove that she stopped working in November of 1992 due to a condition caused by the July 1991 accident. We cannot say that the jury was manifestly erroneous in this finding or in its award of $11,534.00 for past lost earnings.

LOSS OF FUTURE EARNING CAPACITY
Plaintiff contends that the jury abused its discretion in awarding her only $90,000.00 for loss of future earning capacity.
A loss of future earning capacity award is not predicated merely upon the difference between a plaintiff's earnings before and after a disabling injury, but also encompasses the loss of one's earning potential or capacity, that is the loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience, and for which he may receive recompense. Henry v. National Union Fire Insurance Company, 542 So.2d at 106; Landry v. State Farm Insurance Company, 529 So.2d 417, 424 (La.App. 1st Cir.1988). Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured person could have earned despite the fact that he may never have seen fit to take advantage of that capacity, if the injury has deprived him of a capacity he would have been entitled to enjoy, even though he never profited from it. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979); Henry v. National Union Fire Insurance Company, 542 So.2d at 106.
*361 Factors to consider in fixing awards for loss of earning capacity include: age, life expectancy, work life expectancy, appropriate discount rate, the annual wage rate increase, prospects for rehabilitation, probable future earning capacity, loss of earning ability, and the inflation factor or decreasing purchasing power of the applicable currency. Henry v. National Union Fire Insurance Company, 542 So.2d at 107; Brown v. DSI Transports, Inc., 496 So.2d 478, 484 (La.App. 1st Cir.), writ denied, 498 So.2d 18 (La.1986).
An award for loss of earning capacity is inherently speculative and cannot be calculated with mathematical certainty. The most the trier of fact can do is exercise sound discretion and make an award that, in light of all the facts and circumstances, is fair to both parties, while not being oppressive to either. Henry v. National Union Fire Insurance Company, 542 So.2d at 107. After weighing all of the evidence, a jury is free to accept or reject the opinions expressed by experts. Hoyt v. State Farm Mutual Automobile Insurance Company, 623 So.2d 651, 659 (La. App. 1st Cir.), writ denied, 629 So.2d 1179 (La.1993).
When reviewing a trial court's award for loss of earning capacity, an appellate court should give great deference to the trial court. Benoit v. Capitol Manufacturing Company, A Division of Harsco Corporation, 606 So.2d 58, 60 (La.App. 3rd Cir.), writ granted, 609 So.2d 239 (La.1992), affirmed and amended, 617 So.2d 477 (La.1993).
Dr. Rice testified that, using statistics complied in 1979-1980, plaintiff would have a work life expectancy of an additional 20.2 years. However, he indicated that if plaintiff worked to age 62, she would have a work life expectancy of an additional 25 years.
Dr. Rice explained that, in calculating plaintiff's lost earning capacity, he used two starting points: (1) plaintiff's annual salary of $35,986.86 at the time of trial, working with Golden Age Home Care; and (2) plaintiff's annual salary had she continued working as a head nurse at Terrebonne General Medical Center, $59,340.00. Dr. Rice then explained that, because plaintiff was not likely to receive constant amounts over time, and because of the large demand for nurses, he applied a 15% raise to both figures. Dr. Rice then applied a discount rate of 6% and came up with two figures for plaintiff's lost earning capacity. He estimated plaintiff's lost earning capacity to be $448,844.00 for the work life expectancy of 20.2 years and $549,550.00 for the work life expectancy of 25 years.
On cross-examination, Dr. Rice acknowledged that plaintiff's tax returns for 1989 and 1990 do not reflect that she received a 15% bonus. Therefore, he admitted that his projections for loss of future earning capacity would be much lower. Dr. Rice also acknowledged that his figures would be lower if higher paying positions are available to plaintiff.
After considering Dr. Rice's testimony along with all of the other evidence, the jury awarded plaintiff $90,000.00 for loss of future earning capacity. Given the fact that the jury may accept or reject an expert's testimony and the jury's great discretion in assessing quantum, we cannot say that the jury abused its discretion in awarding plaintiff $90,000.00 for loss of future earning capacity.

FRINGE BENEFITS
Plaintiff also contends that the jury abused its discretion in failing to award damages for loss of fringe benefits.
Plaintiff testified that, while she was working at Terrebonne General Medical Center as a head nurse, she contributed 2% percent of her salary to a pension plan and that the hospital matched that amount. Based on this information, Dr. Rice projected that the present value of plaintiff's lost fringe benefits for the work life expectancy of 20.2 years is $18,308.00 and $22,416.00 for the work life expectancy of 25 years.
Although plaintiff testified that she was not currently in a retirement or pension plan with Golden Age Home Care, she qualified that by stating as follows:
They had talked about the pension plan, but they said they'd have to get to me on that later, thatif they were developing it orit really wasn't offered to me at the time.
*362 Plaintiff then indicated that she was uncertain as to whether an employee was required to be employed for a certain length of time prior to becoming eligible for the plan.
After considering plaintiff's testimony as well as that of Dr. Rice, the jury could have concluded that plaintiff would sustain no permanent loss of fringe benefits. Therefore, we find that the jury did not abuse its discretion in failing to award plaintiff this element of damages.

PENALTIES AND ATTORNEY'S FEES
Plaintiff contends that the trial court erred in failing to award penalties and attorney's fees against USAA.
LSA-R.S. 22:658 provides, in pertinent part, as follows:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
* * * * * *
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
Where there exists a reasonable dispute as to the amount of loss, an insurer can avoid imposition of penalties and attorney's fees by unconditionally tendering part of claim which is undisputed. Johnson v. Protective Casualty Insurance Company, 572 So.2d 355, 357 (La.App. 1st Cir.1990); Sibley v. Insured Lloyds, 442 So.2d 627, 632 (La. App. 1st Cir.1983). Tender must be made, considering facts known to insurer at time of tender, in an amount over which reasonable minds could not differ was due claimant. Ken Brady Ford, Inc. v. Roshto, 607 So.2d 1062, 1065 (La.App. 3rd Cir.1992).
A trial court's conclusion concerning the assessment of statutory penalties is, in part, a factual determination which should not be disturbed in the absence of a finding that it is manifestly in error. Sibley v. Insured Lloyds, 442 So.2d at 632.
In the instant case, USAA unconditionally tendered $25,000.00 to plaintiff. After reviewing the record in its entirety, we find that the trial court was not manifestly erroneous in refusing to award plaintiff penalties and attorney's fees against USAA.

COSTS
In its answer to the appeal, USAA contends that the trial court abused its discretion in casting USAA for the costs of the proceedings.
A trial court has broad discretion in assessing court costs and may render judgment for costs against any party as it may consider equitable. LSA-C.C.P. art. 1920; Earles v. Ahlstedt, 591 So.2d 741, 747 (La.App. 1st Cir.1991). On review, a trial court's assessment of costs can be reversed only upon a showing of abuse of discretion. Dornier v. Live Oak Arabians, Inc., 602 So.2d 743, 749 (La.App. 1st Cir.), writ denied 608 So.2d 177 (La.1992); State v. Nicholls College Foundation, 592 So.2d 419, 422 (La. App. 1st Cir.1991), writ denied, 593 So.2d 651 (La.1992).
After reviewing the record in the instant case, we find that the trial court did not abuse its discretion in assessing USAA with the costs of the proceedings.

*363 CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs on appeal are to be divided equally between plaintiff and USAA.
AFFIRMED.
LOTTINGER, C.J., concurs.
NOTES
[1] Donna Thibodeaux was married after the accident and is now known as Donna Pfeifer.
[2] Trooper Roland Rodrigue testified that he investigated the accident scene and found no skid marks or any evidence to indicate that plaintiff had applied her brakes.
[3] This job required that she remain in the office and direct other nurses' care.