JANICE H. PUGH AND WILLIAM PUGH
v.
THE CITY OF PLAQUEMINE AND ITS INSURER, RISK MANAGEMENT, INC.
No. 2008 CA 0358.
Court of Appeals of Louisiana, First Circuit.
December 10, 2008.
NOT DESIGNATED FOR PUBLICATION
YOLANDA J. BATISTE, Plaquemine, LA, THOMAS A. NELSON, New Roads, LA, Counsel for Appellees, Janice and William Pugh.
KAREN DAY WHITE, PAUL A. HOLMES, JOHN Scott THOMAS, Baton Rouge, LA, Counsel for Appellant The City of Plaquemine.
Before: PETTIGREW, DOWNING, McDONALD, McCLENDON and HUGHES, JJ.
HUGHES, J.
The City of Plaquemine appeals an adverse judgment of the 18th Judicial District Court. The judgment found the city liable for injuries sustained by appellee, Ms. Janice H. Pugh, when she fell into a water meter hole.

FACTS AND PROCEDURAL HISTORY
Mr. and Ms. Pugh own and operate Club Secret, a lounge in Plaquemine, Louisiana. The water supply to the club is provided by the City of Plaquemine and requires a water meter on the premises. On April 16, 2004, Ms. Pugh fell on the water meter and sustained injuries including a sprained ankle and a broken toe. Mr. and Ms. Pugh filed an action against the City seeking damages. A trial was held on August 29, 2007. The court issued its ruling from the bench finding in favor of appellees and against appellants in the amount of $17,285.12, including $10,000.00 in general damages, $4,100.00 in lost wages, and $3,185.12 as the stipulated medical specials. The City of Plaquemine appealed that judgment, assigning as error the following factual findings of the trial court:
1) that the plaintiffs had proven the existence of a vice or defect in the meter,
2) that the City had actual or constructive notice of that defect,
3) that the City was 100% at fault, and
4) that the plaintiffs had proven their loss of wage claim.

LAW AND ARGUMENT
A party may recover damages from a public entity under a theory of negligence based on Louisiana Civil Code article 2315[1], or a theory of custodial liability based on article 2317[2], as modified or limited by article 2317.1[3] and LSA-R.S. 9:2800[4].
This court has recently held that:
[t]he burden of proof is the same under either negligence or custodial liability. The plaintiff must prove: (1) the public entity had custody of the thing that caused the plaintiff's damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time; and (4) the defect was a cause-in-fact of the plaintiffs injuries. Morgan v. City of Baton Rouge, XXXX-XXXX pp. 5-6 (La. App. 1 Cir. 4/4/07), 960 So.2d 1013, 1016, writ denied, XXXX-XXXX (La. 9/21/07), 964 So. 2d 342 (Emphasis added).
The two-part test for appellate review of a factual finding is: (1) whether there is a reasonable factual basis in the record for the finding of the trial court; and (2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). "Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines that the trial court's finding was clearly wrong." Morgan, 960 So.2d at 1016-1017, see Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong." Stobart, 617 So.2d at 882-83.

A. The Existence and Knowledge of the Defect
There is no dispute that the meter was in the care and custody of the city or that Ms. Pugh's injuries were caused by her fall on the meter. The disputes lie only with whether the meter contained a defect that created an unreasonable risk of harm and, if so, whether the City knew or should have known of that defect.
William Pugh testified that prior to his wife's fall, the meter had no covering on it at all and that during that time, a lady patron of his bar had also fallen into the hole. He then requested a covering from the City but was informed by a city employee that the meter at the club was "outdated" and that she was not sure if the City even had the proper covering. He was, however, eventually given a covering by "Louis," another city employee.[5] He complained nonetheless that the meter still remained a hazard both because the meter readers were not replacing the lid properly after obtaining their monthly readings and because of the meter's location in a high traffic area. He then spoke to the mayor on at least two occasions about the location of the meter and was advised by the mayor that someone would be sent out to inspect the property. Mr. Pugh testified that although he did not see anyone conduct an inspection of his property, he was informed by the mayor that someone had been sent and that the meter could not be relocated.
Mr. Melvin McClay, a gas and water man for the City of Plaquemines, testified that there were "problems with the old [meter]" at Club Secret. He stated he was a member of the crew that would have been called to relocate the meter, that it would not have been difficult to move the Club Secret meter, and that it would have taken only a day or two.
Mr. Brandon Mellieon, the City Inspector for the City of Plaquemine, also agreed that the meter at Club Secret was in a high traffic area and that it would be more practical to locate the meter elsewhere. He further testified that prior to Ms. Pugh's fall, Mr. Pugh had complained to him about the meter on at least one occasion. When questioned as to why Mr. Pugh would phone him directly, Mr. Mellieon testified that he assumed that Mr. Pugh was not "getting any results or anything with anybody else." He confirmed that he did inspect the area prior to the accident and that he did agree that the area "was a problem." Further, he testified that at one time, the meter at Club Secret was covered by a "makeshift" top. Moreover, although Carrie Collier, a city meter reader, testified that she had never noticed a problem with Club Secret's meter and therefore never reported it as a hazard, she admitted that she knew that the meter was covered by a "makeshift" top.
Based on the testimony of the witnesses, we find that more than a reasonable factual basis exists for the trial court's findings of a defect in the meter and of actual notice to the city. The testimony of the city employees corroborates that of Mr. Pugh. There was obviously an ongoing problem with the covering and the location of Club Secret's meter. We therefore cannot find that the trial court was clearly wrong in its factual findings. These assignments of error lack merit.

B. Fault
In its written findings of fact and reasons for judgment, the trial court stated that "[t]he court does not attribute any liability or contributory negligence to Janice Pugh in causing her own damages." The City argues that pursuant to LSA-C.C. 2323[6], some percentage of fault must be apportioned to Ms. Pugh and that the trial court erred in finding otherwise. We must therefore review the record to determine if there is a reasonable factual basis for finding that the City is 100% at fault for Ms. Pugh's accident.
Ms. Pugh's testimony reveals that she was admittedly aware of both the problems with the meter as well as its location. Ms. Pugh testified that her husband customarily corrected the skewed meter top after the meter readers took their readings, and although she had traversed that route daily since 1996, she had never previously experienced any problems. Moreover, while Ms. Pugh conceded that her husband had made complaints to the City regarding the covering of the meter, she had not personally made any such complaints.
On the day of the accident, Ms. Pugh parked her car in the usual space, walked to the mailbox to retrieve the mail, and looking ahead, began walking in the direction of the club. Ms. Pugh testified that she stepped onto the meter "and it just tripped and I fell in."
The trial court found no fault on the part of Ms. Pugh. In its oral reasons for judgment the trial court pointed out that it did not believe the hole to be so large as to attract the attention of Ms. Pugh and that per the testimony of Mr. Mellieon, the city inspector, the meter cover should withstand even the weight of a vehicle without "kicking up." On that basis, the trial court determined that Ms. Pugh was not at fault for the accident by simply stepping onto the meter top. We find that a reasonable factual basis exists for that determination. This assignment of error lacks merit.

C. Lost Wage Claim
"It is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident." Thibodeaux v. USAA Casualty Insurance Company, 93-2238 (La. App. 1 Cir. 11/10/94), 647 So.2d 351. The trial court is accorded broad discretion in assessing awards for lost earnings, but there must be a factual basis in the record for the award. Driscoll v. Stucker, XXXX-XXXX (La. 1/19/05), 893 So.2d 32.
Further, this circuit has recognized that "[p]ast lost earnings are susceptible of mathematical calculation from proof offered at trial, and an award for this element of damages is not subject to the much discretion rule." Thibodeaux, 647 So.2d at 360, citing Amnions v. St. Paul Fire and Marine Insurance Company, 525 So.2d 60, 65, (La. App. 3 Cir.), writ denied, 525 So.2d 1045 (La. 1988). Moreover, proof sufficient to prove a lost wage claim may be only the plaintiffs own testimony. Jordan v. Travelers Insurance Company, 50508 (La. 2/24/1971), 257 La. 995, 245 So.2d 151, 154-55 (La. 1971).
Both Mr. and Ms. Pugh testified that prior to the accident, Ms. Pugh would prepare boxed lunches for Mr. Pugh to sell at the lounge. After the accident, however, Ms. Pugh was unable to prepare the food and they were therefore forced to quit selling the lunches altogether. And although Mr. Pugh testified that the club was open every week from Wednesday to Sunday and that approximately 85-90 patrons frequented the club each night, absolutely no testimony was introduced to establish how many boxed lunches were sold per week or how much profit was earned off of the sale of one lunch. Nevertheless, the trial court awarded plaintiffs the amount of $4,100.00 in past lost wages, calculated as follows:
$5.00 per day (one chicken dinner) times 5 days per week=$25.00 $25.00 times 4 weeks per month=$100.00 per month $100.00 times 41 months (the time of the accident until the date of trial)=$4,100.00
Based on the record, we cannot find that a factual basis exists to sufficiently establish the plaintiffs lost wage claim. We find merit to this assignment of error and reverse the portion of the judgment awarding plaintiffs lost wage damages.

CONCLUSION
The judgment of the trial court is reversed as to that portion awarding plaintiffs $4,100.00 in lost wages. The judgment is affirmed in all other respects. All costs of this appeal are assessed against the appellant, the City of Plaquemine.
REVERSED IN PART, AFFDUVIED IN PART.
McCLENDON, J., agrees in part and dissents in part.
I must disagree with the conclusion that the trial court did not err in finding the City 100% at fault for Ms. Pugh's injuries. The evidence clearly establishes that some degree of comparative fault should have been attributed to Ms Pugh. Therefore, I respectfully dissent in part.
NOTES
[1] LSA-C.C. art. 2315:

A. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
B. Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person. Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease. Damages shall include any sales taxes paid by the owner on the repair or replacement of the property damaged.
[2] LSA-C.C. art. 2317:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
[3] LSA-C.C. 2317.1:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
[4] LSA-R.S. 9:2800:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Where other constructions are placed upon state property by someone other than the state, and the right to keep the improvements on the property has expired, the state shall not be responsible for any damages caused thereby unless the state affirmatively takes control of and utilizes the improvement for the state's benefit and use.
C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
D. Constructive notice shall mean the existence of facts which infer actual knowledge.
E. A public entity that responds to or makes an examination or inspection of any public site or area in response to reports or complaints of a defective condition on property of which the entity has no ownership or control and that takes steps to forewarn or alert the public of such defective condition, such as erecting barricades or warning devices in or adjacent to an area, does not thereby gain custody, control, or garde of the area or assume a duty to prevent personal injury, wrongful death, property damage, or other loss as to render the public entity liable unless it is shown that the entity failed to notify the public entity which does have care and custody of the property of the defect within a reasonable length of time.
F. A violation of the rules and regulations promulgated by a public entity is not negligence per se.
G. (1) "Public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions. Public entity also includes housing authorities, as defined in R.S. 40:384(15), and their commissioners and other officers and employees and sewerage and water boards and their employees, servants, agents, or subcontractors.
(2) "Public site or area" means any publicly owned or common thing, or any privately owned property over which the public's access is not prohibited, limited, or restricted in some manner including those areas of unrestricted access such as streets, sidewalks, parks, or public squares.
[5] It is unclear from the record whether "Louis" is the same employee that informed him that the meter was "outdated."
[6] LSA-C.C. 2323:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.