700 So.2d 831 (1996)
Charles G. MOORE, Jr. et al.
v.
SAFEWAY, INC. et al.
No. 95 CA 1552.
Court of Appeal of Louisiana, First Circuit.
November 22, 1996.
Rehearing Denied October 30, 1997.
*836 Janice M. Church, Baton Rouge, for Plaintiffs/Appellees Charles G. Moore, Jr., Verna Moore and Ellis Moore.
T. Randolph Richardson, New Orleans, for Defendant/Appellant Figgie International, Inc. Safway, Inc.
Boris F. Navratil, Baton Rouge, for Defendant/Appellant Shell Chemical Company and Shell Oil Company.
James E. Blazek, Tyson B. Shofstahl, New Orleans, for Defendant/Appellee Brand Scaffold Services, Inc.
Floyd M. Thomas, Jr., El Dorado, AR, for Defendant/Appellee Figgie International, Inc.
Kirk L. Landry, Baton Rouge, for Intervenors Continental Casualty Co. and ESIS, Inc.
Before SHORTESS, PARRO and KUHN, JJ.
KUHN, Judge.
Charles Moore ("Moore") was injured on the premises of Shell Oil Company. Moore's direct employer, Jacobs Constructors, Inc. ("Jacobs"), immune from liability under the provisions of the Workers' Compensation Act,[1] was not a party to the subsequent lawsuit. After a trial by jury, the jury assessed fault against Jacobs in accordance with then-existing Louisiana jurisprudence. The jury found Moore, Jacobs, Shell Oil Company ("Shell") and Figgie International, Inc., Safway Division ("Safway"),[2] the manufacturer *837 of an allegedly defective product, each at fault in causing plaintiffs' damages. The trial judge reapportioned the percentage of fault attributed to Jacobs among the other defendants to whom the jury attributed fault and rendered judgment. The jury assessed damages and judgment was signed awarding damages to plaintiffs reduced by the percentage of fault attributed to plaintiff. This appeal by plaintiffs and defendants followed.

FACTS AND PROCEDURAL BACKGROUND
Plaintiff, Charles Moore, was employed as a scaffolding carpenter for Jacobs. Jacobs, an independent contractor of Shell, was engaged in the erection and dismantling of a scaffolding assembly,[3] at Shell's Geismar plant in Ascension Parish on May 8, 1990. The Jacobs crew received a work order to dismantle a scaffolding assembly at the EO2 unit of the Geismer facility. The crew commenced the process of dismantling the scaffolding assembly; however, the project was not completed. The next morning, the Jacobs crew received a higher-priority order to assemble scaffolding in another area of the Shell plant. Subsequently, the crew went to lunch and attended a safety meeting. Thereafter, a four-person crew, of which plaintiff was a member, returned to the EO2 unit to complete the process of dismantling the scaffolding assembly. Moore ascended the ladder to attempt to reach the top level of the multi-decked scaffolding system. In an effort to access the platform of the top deck, Moore shifted his weight onto a loosened handrail, and fell approximately twenty feet, face-first onto concrete pavement. As a result, he sustained serious injuries and was immediately taken for medical attention.
On May 9, 1991, Moore and his wife, Verna, (collectively "plaintiffs") filed a petition for damages, naming as defendants Shell, Jacobs' principal contractor; Safway, the manufacturer of the scaffolding assembly from which Moore fell; and Brand Scaffolding Services, Inc. ("Brand"), a distributor and owner of some of the components of the scaffolding assembly from which Moore fell.[4]
After a nine-day trial, the jury concluded Jacobs was seventy-five percent at fault, Shell and Moore were each five percent at fault, and Safway was fifteen percent at fault in causing plaintiffs' damages. The jury found no negligence or fault on the part of Brand. After initial deliberations by the jury, the trial judge determined some of its responses to the interrogatories were inconsistent with one another and/or with the verdict. Thereafter, the trial judge instructed the jury in light of the inconsistencies and returned it for further deliberations. Subsequent to its second deliberations, the jury adjusted certain of the interrogatory responses; however, it left in tact its initial assessment of fault. The jury's awards of damages totaled $3,552,464.31 for Moore's losses, $200,000 for Verna Moore's loss of consortium claim, and $50,000 for Ellis "Ray" Moore loss of his father's society and services. The trial judge reapportioned the employer's fault pursuant to Gauthier v. O'Brien, 618 So.2d 825 (La.1993). As a result of the reapportionment, Shell and Moore were each held twenty percent at fault and Safway was held sixty percent at fault. A judgment, reduced by the twenty percent of fault attributable to Moore, was signed on September 6, 1994. All parties, except Brand, appealed.
All appellants raise the following issue:
Whether the trial court erred by applying Gauthier to redistribute employer fault among those parties assessed with fault by the jury. ("Issue No. 1") Additionally, Safway raises the following issues:
(a) Whether the trial judge erred in returning the jury for further consideration of its answers and the verdict ("Issue No. 2");
(b) Whether the trial court's initial jury instructions (before the jury deliberated a *838 second time) were prejudicial to Safway ("Issue No. 3");
(c) Whether the jury's finding that Safway's product was unreasonably dangerous for failure to provide an adequate warning is erroneous ("Issue No. 4");
(d) Whether the trial court erred in awarding legal interest from the date of judicial demand on post-judgment, future damages ("Issue No. 5");
(e) Whether the jury's apportionment of fault is contrary to the law and evidence ("Issue No. 6").
Safway is joined by Shell in urging the following issue:
Whether the jury's awards of damages are abusively high.
Shell raises the following additional issues:
(a) Whether the trial court erred by denying its motion in limine relative to Shell's statutory employer defense ("Issue No. 8");
(b) Whether the trial court erred in failing to give the jury a requested instruction relative to Shell's statutory employer defense ("Issue No. 9");
(c) Whether the evidence supports the jury's determination that the work Moore was engaged in at the time of the accident was not integral to Shell's operations ("Issue No. 10");
(d) Whether the trial court erred by denying Shell's motion for judgment notwithstanding the verdict relative to Shell's statutory employer defense ("Issue No. 11");
(e) Whether the evidence supports the jury's conclusion that Shell was negligent; and whether the trial court erred in denying Shell's motion for judgment notwithstanding the verdict relative to the jury determination that Shell was negligent ("Issue No. 12").
Plaintiffs raise the following issues on appeal:
(a) Whether the trial court erred by failing to include any interrogatories addressing custodial (strict) liability on the verdict form ("Issue No. 13");
(b) Whether the jury erred in finding that the Safway scaffolding was not defective in design ("Issue No. 14");
(c) Whether the jury's award for future medical expenses and prescription drugs is abusively low ("Issue No. 15"); and
(d) Whether the jury's award for future pain and suffering is abusively low ("Issue No. 16").
We first turn our attention to the verdict from to which the jury was directed to respond.
The jury initially completed the verdict form as follows.
1. Was the scaffold component or components manufactured
 by defendant [Safway] defective in design so as
 to be unreasonably dangerous from a reasonably
 anticipated use?
 Yes _______ No x 
2. If you found the scaffold component or components
 manufactured by [Safway] was defective in design,
 did the plaintiff prove by a preponderance of the
 evidence that there existed an alternative design for
 the scaffold capable of preventing Mr. Moore's accident?
 Yes _______ No _______
3. Was the scaffold component or components manufactured
 by [Safway] defective so as to be unreasonably
 dangerous because an adequate warning about the
 scaffold has not been provided?
 Yes x No _______
4. If you found the scaffold unreasonably dangerous
 because it lacked an adequate warning, was the
 danger to Mr. Moore open and obvious as an ordinary
 user and handler of the scaffold?
 Yes x No _______
5. If you found the scaffold unreasonably dangerous
 because it lacked an adequate warning, was Mr.
 Moore a user or handler of the scaffold who already
 knew or reasonably should have known of the characteristic
 of the scaffold that may cause damage and
 the danger of such characteristic?
 Yes x No _______
6. Do you find from a preponderance of the evidence
 that Brand personnel were negligent?
 Yes _______ No x 
7. If you (sic) answer to Question No. 6 was "Yes", do
 you find that any such negligence was a cause-in-fact
 and a legal cause of plaintiffs' injuries?
 Yes _______ No _______
8. Do you find from a preponderance of the evidence
 that any Shell personnel were negligent?
*839
 Yes _______ No x 
9. If you (sic) answer to Question No. 8 was "Yes", do
you find that any such negligence was a cause-in-fact
and a legal cause of plaintiffs' injuries?
Yes _______ No _______
10. Do you find from a preponderance of the evidence
 that any Jacobs personnel were negligent?
Yes x No _______
11. If you (sic) answer to Question No. 10 was "Yes",
 (sic) do you find that any such negligence was a
 cause-in-fact and a legal cause of plaintiffs' injuries?
 Yes x No _______
12. Do you find that Charles Moore was negligent?
 Yes x No _______
13. If you (sic) answer to Question No. [12] was "Yes",
 do you find that such alleged negligence was a cause-in-fact
 and a legal cause of plaintiffs' injuries?
 Yes _______ No x 
14. Do you find that the work that Charles Moore was
 doing at the time of the accident was an integral part
 of Shell's business?
 Yes _______ No x 
15. Please state the percentage of fault, if any, to be
 attributed to each party that you have found at fault.
 (Your total must equal 100%)
 Safway 15 %
 Brand 0 %
 Shell personnel 5 %
 Jacobs personnel 75 %
 Charles Moore 5 %
 If you attributed fault to Safway, Brand, Shell or Jacobs,
proceed to Question (sic) 16, 17 and 18. If you do
not, sign the form and return to the courtroom.
16. State the amount of each of the following damages
 which you find from a preponderance of the evidence
 were sustained by Charles Moore as a result of the
 occurrence:
 a. Past Lost Earnings Answer: $ 113,000.00
 b. Future Lost Earnings
 and Earning Capacity Answer: $ 453,000.00
 c. Past Medical Expenses Answer: $ 99,239.31
 d. Future Medical Expenses
 and Future
 Prescriptions Drugs Answer: $ 1,887,225.00
 e. Past, Pain, and Suffering
 Mental anguish
 and physical and
 mental disabilities Answer: $ 500,000.00
 f. Future Pain, and Suffering,
 Mental anguish
 and physical
 and mental disabilities Answer: $ 500,000.00
17. State the amount of damages, if any, which you find
 from a preponderance of the evidence were sustained
 by Verna Moore for Loss of Spousal Society, Service
 and Consortium.
 Answer: $ 200,000.00
18. State the amount of damages, if any, which you find
 from a preponderance of the evidence were sustained
 by Ray Moore for Loss of Father's Society and
 Services.
 Answer: $ 50,000.00
SO SAY WE ALL
 /s/ Byron K. Beaucoudry
 FOREMAN
 8/4/94 
 DATE
Thus, in the verdict form provided, the jury was required to provide a response to the question of each defendant's negligence. The inquiry eliciting a determination of each defendant's negligence could have been answered affirmatively or negatively. If the jury responded in the affirmative (i.e., it concluded that the defendant was liable to the plaintiffs), then the verdict form directed the jury to respond to special interrogatories regarding that defendant's liability. We now examine the jury's responses.

CONSISTENCY OF ANSWERS AND THE VERDICT

(Issue No. 2)
Safway challenges the propriety of the trial judge's decision to return the jury for further consideration of its answers and the verdict. The trial judge determined the answers to interrogatories No. 5 and 8 were inconsistent with the response to interrogatory No. 15 and also concluded the answers to interrogatories No. 12 and 13 were inconsistent with one another. Safway asserts the verdict (award of damages) and the jury's first response to interrogatory No. 5 (finding Moore was a user or handler of the scaffold and knew or reasonably should have known of the characteristic of the scaffold that may *840 cause damage) were harmonious, and thus, the trial court should have directed judgment in accordance with the answers, and disregarded the assessment of 15 percent of the fault against it, thereby exonerating Safway from liability.
La.C.C.P. art. 1813 states in relevant part:
C. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.
D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.
In House v. Thompson, 452 So.2d 1195 (La.App. 1st Cir.), writ denied, 457 So.2d 15 (La.1984), this court held that when a trial court directs a jury to give answers to interrogatories and to render a general verdict, and the answers and the verdict are inconsistent, the trial court has three options: (1) to direct entry of the judgment in accordance with the answers, notwithstanding the verdict; (2) to order a new trial; or (3) to return the jury for further consideration of its answers and its verdict. The choice of which option to exercise is a matter within the sound discretion of the court. In the case now before us, the trial judge instructed the jury on its inconsistencies and returned the jury for further consideration of its answers. After further deliberations, the jury altered its responses to interrogatories No. 5, 8, 9, and 13. Responding to interrogatory No. 5, "If you found the scaffold unreasonably dangerous because it lacked an adequate warning, was Mr. Moore a user or handler of the scaffold who already knew or should have known of the characteristic of the scaffold that may cause damage and the danger of such characteristic ...," the jury changed its answer from "yes" to "no." The jury changed its response to interrogatory No. 8 to reflect a finding that Shell personnel had been negligent. The jury responded to No. 9 (which it initially left blank) so as to conform with the response to No. 8 and found the negligence of Shell personnel was a cause-in-fact and a legal cause of plaintiffs' injuries. The response to interrogatory No. 12 was not changed; however, the jury altered its answer to interrogatory No. 13 so as to find the negligence of Charles Moore was a cause-in-fact and a legal cause of plaintiffs' injuries.[5]
The parties do not dispute the jury's responses to interrogatories No. 12 and 13 were inconsistent. Likewise, it is uncontested that the jury's answer to interrogatory No. 8, finding Shell was not negligent, and the assessment of five percent of liability to Shell in the apportionment of fault interrogatory appeared to be an inconsistency.[6] Under the provisions of La.C.C.P. art. 1813 and the jurisprudence, we find no abuse of discretion by the trial court in opting to return the jury for further consideration of its answers and the verdict.[7]
Moreover, it is abundantly clear the jury concluded there was liability insofar as *841 plaintiffs' claims against Shell and Safway. Reading the jury interrogatories as a whole, no other conclusion can be reached. Confronted with answers to some of the interrogatories which were inconsistent with the jury's assignments of percentages of fault of Shell and Safway in interrogatory No. 15, the trial judge addressed the situation appropriately and exercised very sound discretion by instructing the jury to reconcile the differences in its responses.
The jury's obvious conclusion that Shell and Safway are at fault is underscored by the fact that it reconciled the inconsistent responses to the interrogatories in a manner that determined those defendants are liable to plaintiffs. Certainly, after being given the opportunity to reconcile the inconsistent responses to the interrogatories, if the jury were of the opinion Shell and Safway were not at fault in causing plaintiffs' damages, it could have easily indicated so. Therefore, the error, if any, was harmless.
We are mindful of the mandate which requires that this court thoroughly review records to ascertain whether errors of law are present or whether factual findings are manifestly erroneous or clearly wrong. Thus, if we were required to conduct a de novo review because the trial judge committed an error in law by instructing the jury to reconcile the differences in its responses to the interrogatories, we would reach the same conclusion the jury did in its assignments of percentages of fault to Shell and Safway in interrogatory No. 15. See Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975). It is not the province of the appellate court to substitute its judgment for that of the factfinder.

PROPRIETY OF JURY INSTRUCTIONS

(Issue No. 3)
Safway maintains the trial court's instructions to the jury given in conjunction with returning it for further deliberations were so prejudicial and consequential that the verdict is not entitled to a presumption of regularity. Safway urges this court to remand for a new trial.
A trial judge has a duty to charge the jury as to the law applicable in a case. Haydel v. Hercules Transport, Inc., 94-1246, p. 17 (La.App. 1st Cir. 4/7/95); 654 So.2d 418, 429, writ denied, 95-1172 (La. 6/23/95); 656 So.2d 1019. The adequacy of jury instructions must be determined in light of the instructions as a whole. Belle Pass Terminal, Inc. v. Jolin, Inc., 92 1544, p. 36, (La. App. 1st Cir. 3/11/94); 634 So.2d 466, 488, writ denied, 94-0906 (La. 6/17/94); 638 So.2d 1094. It is the trial judge's responsibility to reduce the possibility of confusing the jury, and he (she) may exercise the duty to decide what law is applicable. An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that jury instructions were so erroneous as to be prejudicial. Daigle v. Legendre, 619 So.2d 836, 839 (La.App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).
Safway argues the following jury instructions were prejudicial:
All right. Now, let me try  and I'm walking a tightrope because I can't comment on the evidence. I'm going to try to tell you how you were inconsistent without commenting on the evidence. And that's very difficult to do, but I'm going to do the best I can. And it's unfortunate that you've got so many questions. We don't usually see this, but you've got so many defendants, and it's really  it's complicated for these lawyers. You saw that. None of them agreed on anything. All right. The first one, "Was the scaffold component manufactured by defendant Safway Steel Products defective in design?" You said "no." And No. 2, you left it blank. That's consistent. No problem with that. Now, Question No. 3 was, "Was the scaffold component manufactured by Safway Steel Products detective (sic) or components so as to be unreasonably dangerous because an adequate warning about the scaffold had not been provided?" You answer was "yes." Okay? ... No. 4, it said, "If you found that the scaffold was unreasonably dangerous because it lacked an adequate warning, was the danger to Mr. Moore open and obvious as an ordinary user and handler of the scaffold?" You said "no." Okay. Number 5, "If you found the scaffold unreasonably dangerous *842 because it lacked an adequate warning, was Mr. Moore a user or handler of the scaffold who already knew or reasonably should have known of the characteristics of the scaffold that may cause damage and the danger of such characteristic?" And you answered "yes." Okay? But then when you went from that, you allocated 15 percent of the damages to Safway. Okay? Now, you found in No. 3 that the scaffold was defective because there was not an adequate warning for an ordinary user and handler of the scaffold, but you went further and said that Mr. Moore, who already knew or reasonably should have known of the characteristic, and therefore you say that he was  excuse me. I'm getting confused, too. In No. 5 you say, "If you found the scaffold unreasonably dangerous because it lacked an adequate warning, was Mr. Moore a user who already knew or should have known of the characteristic?" You say "yes." Well, if he was skilled enough to know all of this, Safway was under no legal duty to warn him. Okay? But you went and gave them 15 percent of the liability, and that's inconsistent. If they didn't have to warn Mr. Moore, you can't assess him (sic) with any liability....
Safway specifically contends it was prejudiced when the trial judge stated, "If they didn't have to warn Mr. Moore, you can't assess him with any liability" because the instruction erroneously linked Moore's liability (instead of Safway's) to Safway's alleged duty to warn.
To determine whether Safway was prejudiced by the enumerated instructions, we must inquire whether the jury instructions as a whole properly reflect the applicable law. Before initially retiring the jury, the trial judge clearly instructed the jury that if it found Safway breached a duty to warn, it should assess liability against Safway. Furthermore, the trial judge explained to the jury, "Basically stated, you can't find that somebody was not negligent and then go assess them with some of the damages." Therefore, we conclude the trial court properly instructed the jury that if it found Safway did not breach its duty to warn, the jury should not assess fault against Safway.

PROPRIETY OF THE VERDICT FORM

(Issue No. 13)
Plaintiffs assert the failure to include any interrogatories addressing the custodial (strict) liability of Shell and Brand under La.C.C. art. 2317 on the verdict form was error.
An objection to the court's failure to give a particular charge or interrogatory must be made before the jury retires to deliberate. La.C.C.P. art. 1812. Failure to object timely constitutes waiver of that objection; the issue may not be raised for the first time on appeal. Wiggins v. Exxon Corp., 590 So.2d 1209, 1210 (La.App. 1st Cir.1991), writ denied, 595 So.2d 660 (La.1992).
The trial judge instructed the jury on custodial liability under the provisions of La. C.C. art. 2317; however, the verdict form did not include interrogatories eliciting the jury's responses as to its applicability to the facts in this case. Although plaintiffs did not object to the omission of special interrogatories addressing La.C.C. art. 2317 liability until after the jury had begun its initial deliberations, it is unclear from the record whether the objection was properly preserved. Prior to instructing the jury, the trial judge stated, "[M]ake a note for the record that the court has reserved all parties' rights to enter their objections to the proposed and used charges after the jury retires." Immediately after the jury was retired, the parties stated their objections to the jury instructions at which time plaintiffs asserted "a blanket objection as to the interrogatories." We note plaintiffs did not specifically state that the basis of their "blanket objection" was the omission of interrogatories addressing liability under La. C.C. art. 2317.
After the trial judge's explanation to the jury of the inconsistencies between the interrogatory responses, and while the jury was deliberating for a second time, counsel for plaintiffs stated, "I'm saying on the record that if they [the jury] change their answer on the failure to warn that we preserve our right to request that they need to go back with the custodial liability." The jury returned but it did not change its initial determination *843 that Safway breached its duty to provide an adequate warning about the scaffold. Instead, the jury altered its response to interrogatory No. 5 and found Moore was not a user or handler who already knew or should have known of the characteristic of the scaffolding assembly that may cause damage.
Although the trial judge accepted the verdict, the jury was not discharged. The record shows the jury was required to return the following court day to permit the parties an opportunity to raise any matters which had not already been decided. Nevertheless, plaintiffs did not raise any objections. Because plaintiffs did not state the basis of their "blanket objection as to the interrogatories," the trial judge was not afforded an opportunity to remedy the alleged error. Accordingly, we conclude plaintiffs failed to object timely to the omission of special interrogatories addressing custodial liability, and, therefore, waived their right to have the jury decide this issue.

IV. STATUTORY EMPLOYER DEFENSE

(Issues Nos. 8, 9, 10 and 11)
Shell maintains it is immune from tort liability as a "statutory employer" under the provisions of the Workers' Compensation Act.[8] Prior to 1989, La.R.S. 23:1061 provided:
When any person, (in this Section referred to as the principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this Section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
When the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor.
By Act No. 454 of 1989, effective January 1, 1990, the legislature added a second sentence to the first paragraph of § 1061, which provides:
The fact that work is specialized or nonspecialized, is extraordinary construction or simple maintenance, is work that is usually done by contract or by the principal's direct employee, or is routine or unpredictable, shall not prevent the work undertaken by the principal from being considered part of the principal's trade, business, or occupation, regardless of whether the principal has the equipment or manpower capable of performing the work.
Under the statute and interpretative jurisprudence, in those instances where the principal is liable to pay workers' compensation benefits, the principal is commonly referred to as the "statutory employer." In exchange for the workers' compensation responsibility, these principals enjoy tort immunity for work-related injuries suffered by the employees of the principal's contractors. La.R.S. 23:1032. Thus, a finding that the work being performed by the injured employee was a part of the principal's trade, business or occupation results in a finding of statutory employer status and tort immunity.
*844 While this matter has been pending on appeal, the Supreme Court enunciated the test for the determination of whether a principal is a statutory employer so as to be immune from tort liability in Kirkland v. Riverwood Int'l USA, Inc., 95-1830 (La. 9/13/96); 681 So.2d 329.[9] In Kirkland, a paper products mill had contracted with an independent contractor to remove existing conveyors and to replace them with state-of-the-art electronically controlled conveyors. Plaintiff, an employee of the independent contractor, was injured while performing part of the contract work. Plaintiff filed suit and the paper products mill moved for summary judgment urging it was the statutory employer of plaintiff and, as such, was immune from tort liability. The trial court agreed with the paper mill and rendered summary judgment in favor of the paper mill. The court of appeal reversed. In its affirmance of the appellate court's reversal, the Supreme Court reviewed the history of the statutory employer doctrine. Id. at pp. 330-31.
The Kirkland court noted the restrictive construction that the statutory employment relationship had been given historically,[10] which culminated in the landmark decision of Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986). In Berry, the Supreme Court adopted a test more in line with the purpose of the workers' compensation provisions (i.e., to preclude a principal from contracting out the essential economic activities of an enterprise to impecunious subcontractors so as to exculpate itself from liability). Kirkland, 681 So.2d at p. 334. Under the Berry analysis, the principal had to clear three hurdles to be classified a statutory employer:
(1) Is the contract work specialized? Specialized work, as a matter of law, was not a part of the principal's trade, business or occupation, and the principal was not the statutory employer of the specialized contractor's employees;
(2) Where the contract work is non-specialized, the court had to compare the contract work with the principal's trade, business or occupation. At this level, the court was required to make the following inquiries:
(i) Is the contract work routine and customary? Is it regular and predictable?
(ii) Does the principal have the equipment and personnel capable of performing the work?
(iii) What is the practice of the industry? Do industry participants normally contract out this type of work or do they have their own employees perform the work?
(3) Was the principal engaged in the work at the time of the alleged accident?
Berry, 488 So.2d at 937-939.
In interpreting the 1989 amendment to § 1061, the Kirkland court stated:
[T]he 1989 amendment is designed primarily to overrule that part of Berry dealing with specialization per se and to declare that a finding of specialization is not determinative of the absence of a statutory employment relationship. The 1989 amendment does not prohibit the court's considering the factors enumerated in Berry; the amendment merely proscribes making any one of the factors conclusive of the determination of whether the contract work was part of the principal's trade, business or occupation. In effect, we interpret the 1989 amendment as intended to overrule Berry, but not intended to overrule this court's decisions, in the ten years preceding Berry, that the court was to consider all pertinent factors under the totality of the circumstances. (Footnote omitted.)
Kirkland, 681 So.2d at pp. 336.
The Supreme Court, in Kirkland, held that the appropriate standard for determining *845 whether the contract work is part of the alleged principal's trade, business or occupation is for the court to consider all pertinent factors under the totality of the circumstances. The court explained that the presence or absence of any one factor is not determinative, and the presence of one factor may compensate for the lack of another. Those factors include:
(1) The nature of the business of the alleged principal;
(2) Whether the work was specialized or non-specialized;
(3) Whether the contract work was routine, customary, ordinary, or usual;
(4) Whether the alleged principal customarily used his own employees to perform the work, or whether he contracted out all or most of such work;
(5) Whether the alleged principal had the equipment and personnel capable of performing the contract work;
(6) Whether those in similar businesses normally contract out this type of work;
(7) Whether the direct employer of the claimant was an independent business enterprise who insured his own workers and included that cost in the contract; and
(8) Whether the principal was engaged in the contract work at the time of the accident.
Applying the totality of the circumstances test to the facts of this case, we first address the jury's determination. The verdict form included the following interrogatory, "Do you find that the work that Charles Moore was doing at the time of the accident was an integral part of Shell's business?" [11] The jury responded in the negative and, hence, concluded that Shell was not Moore's statutory employer so as to make it immune from tort liability. Although on appeal the parties have not raised the propriety of the submission to the jury of this interrogatory, we find the integral relations test presented to the jury is not dispositive of the issue of whether Shell was Moore's statutory employer in light of the standard enunciated in Kirkland. Because Shell has urged on appeal that the jury erred in its determination that Shell is not Moore's statutory employer, we examine the record de novo to make this determination based on the totality of the circumstances after considering the factors set forth in Kirkland. See Gonzales v. Xerox Corp., 320 So.2d at 165 (La.1975).
It is essentially undisputed that Shell was in the petrochemical business and not in the scaffolding business. Jeff Hall, Shell's engineering maintenance manager on the day of the accident, testified that Shell was in the petrochemical business which involved the refining of petroleum products to make gasoline, and the refining of chemical products to make detergents. The testimony of Edward Lagucki, another Shell maintenance manager, corroborates Hall's explanation of Shell's business and acknowledges that Shell was not engaged in the business of assembling scaffolding. Hall also testified that Shell developed their own "maintenance organization in the early [1980's], and at the time [they] did train some maintenance technicians to install and dismantle scaffolding." Hall explained that because of the contract with Jacobs, he did not renew the training of any Shell scaffold technicians in 1990. According to Hall, from 1984 to 1985, Shell classified scaffolding assembly as "specialty work." The testimony of Kenneth Hughes, a scaffold carpenter on the accident date, was also insightful to our totality of the circumstances inquiry. Hughes estimated Shell only owned approximately five to ten percent of the scaffolding equipment used at the Geismer plant, and Shell did not have the expertise to supervise the erection or dismantling of the scaffolding. Lastly, an examination of the contract between Jacobs and Shell shows that the independent contractor was required to provide workers' compensation benefits to its employees as a condition of doing business with Shell.
After considering the facts of this case in light of the factors set forth in Kirkland, we conclude the overwhelming evidence establishes *846 that there was no statutory employment relationship between Shell and Moore.[12]

NEGLIGENCE

(Issue No. 12)
Shell asserts there is no evidence to support the jury's finding of independent negligence on its part; therefore, it argues the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV"). Shell urges because it had no duty to supervise Jacobs employees or to discover and remedy any unsafe conditions Jacobs employees would be exposed to at the work site, the jury was erroneous in finding it liable, and the trial court erred by not granting its motion for JNOV.
In order for Shell to be liable under La.C.C. art. 2315, plaintiffs must show Shell owed Moore a duty, Shell breached that duty, and their damages resulted from that breach. Crane v. Exxon Corp., U.S.A., 613 So.2d 214, 221 (La.App. 1st Cir.1992), amended on other grounds, 633 So.2d 636 (La.App. 1st Cir.1993). The question of whether a person owes a duty to another is a question of law. Harris v. Pizza Hut, 455 So.2d 1364, 1371 (La.1984). The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill that duty. Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). Thus, we must determine whether Shell owed a duty to Moore to protect him from danger associated with the unlocked handrail of the scaffolding assembly.
Under the provisions of the contract Shell maintained the right to inspect all aspects of the job at any time to monitor compliance with its specifications.[13] Although Shell may not have been obligated to perform its contractual right to inspect, the record shows Shell did undertake such a performance.
Both Hall and Lagucki explained Shell's operational procedure. According to the testimony of these Shell maintenance managers, an operations organization operator was required to go out to the work site and inspect it for unsafe or hazardous conditions. An independent contractor could access the work site only with a permit, and a permit would issue only after the Shell operator's inspection was performed. Although he could not identify the name of the Shell employee, Moore testified an operator went out to the EO2 unit with him on the day of the accident, and prior to issuing a work permit for Jacobs to resume its dismantling of the scaffolding system, the Shell operator "looked up" at the scaffolding. Subsequently, the operator wrote up the work permit which gave Moore authority to resume work. Lagucki acknowledged Moore's testimony was in conformity with Shell's standard operational procedure.
If a person undertakes a task which he has no duty to perform, he must perform that task in a reasonable and prudent manner. Negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability. Crane, 613 So.2d at 221.
*847 Based on the testimony of Shell's maintenance managers explaining Shell's standard operational procedure for work permit issuance, the jury may have concluded Shell's operations organization operator assumed the task of monitoring the job site for violations of Shell's safety standards. In so concluding, the jury may have reasoned the purpose of Shell's voluntary performance of its contractual right to inspect included protecting Jacobs employees from unsafe conditions. Having assumed this responsibility, the operator would have had a duty to perform it in a reasonable and prudent manner. By issuing the work permit on the day of the accident and allowing Moore to access a work site which was in an unsafe condition (i.e., the handrail in an unlocked position in the scaffolding assembly), the jury may have concluded the Shell operations organization operator who issued the work permit violated Shell's duty to Moore to exercise reasonable care in inspecting the job site for safety violations. Had the Shell operator exercised reasonable care in his inspection of the EO2 unit worksite, a work permit authorizing Moore and the Jacobs crew to resume the process of dismantling the scaffolding assembly would not have issued and the accident could have been avoided.
Furthermore, the jury may have also concluded Shell was negligent in its method of directing employees of Jacobs. The testimony of J.D. Roberts, a safety expert, Terry Simoneaux, a co-employee of Moore's, and Lagucki described how Shell established priorities for the work it determined needed to be completed by Jacobs. According to the testimonial evidence, Shell's prioritizing of projects was accomplished through the use of work tickets which would be designated "A" or "E" by Shell. "E" ticket projects had the highest priority. When Jacobs employees were working on a project which Shell had designated as an "A" ticket, and subsequently Shell determined Jacobs needed to attend to an "E" ticket project, the Jacobs crew was required to stop the "A" ticket project and commence the "E" ticket project. Often times, this would involve shifting the crew from one location to another within the Geismer plant. Only after the "E" ticket project was completed were Jacobs employees permitted to return to an "A" ticket project.
Roberts explained the system Shell utilized to prioritize Jacobs' work projects did not allow for the competent supervision of Jacobs employees by Jacobs supervisors. According to Roberts, Shell's procedure of moving the members of the Jacobs crew from one job site to another after the crew had commenced the dismantling of the Systems scaffolding assembly at the EO2 unit on May 8, 1990, was a root cause of the accident.
Based on this evidence, the jury may have concluded Shell undertook a duty to direct the prioritization of Jacobs work projects and, in so doing, precluded the competent supervision of Jacobs employees by Jacobs supervisors. The jury may have reasoned the procedure Shell implemented to prioritize Jacobs work projects was not a reasonable and prudent one and that without Shell's direction of Jacobs' work projects the accident may have been avoided.
In ruling on a motion for JNOV under the provisions of La.C.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds that it points so strongly and overwhelmingly in favor of the moving party that reasonable minds could not arrive at a contrary verdict on that issue. Belle Pass Terminal, Inc., 92-1544, at pp. 41-42; 634 So.2d at 491-92. If there is substantial evidence opposed to the motion of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Belle Pass Terminal, Inc., 92-1544 at p. 42; 634 So.2d at 492. Basically, a trial court can grant a JNOV only when a jury's verdict is one which reasonable persons could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Id.
In considering a motion for JNOV, the trial court must construe all evidence and reasonable inferences to be made therefrom *848 in favor of the party opposed to the motion. In applying this standard, the court cannot weigh the evidence, pass on credibility of witnesses, or substitute its judgment of the facts for that of the jury. Id.
Mindful of the standard of review for a motion for JNOV, we are convinced there is sufficient evidence to support the jury's determination, and based on that evidence, we find reasonable minds could conclude Shell was negligent. Thus, the trial court's denial of Shell's motion for JNOV was proper.[14]

LOUISIANA PRODUCTS LIABILITY ACT
The jury concluded the scaffolding component manufactured by Safway was not defective in design but it was unreasonably dangerous because an adequate warning had not been provided.
The Louisiana Products Liability Act ("LPLA") establishes the exclusive theories of liability for manufacturers for damage caused by their products in La.R.S. 9:2800.54 in part as follows:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
* * * * * *
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
* * * * * *
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
"Reasonably anticipated use" is defined in La.R.S. 9:2800.53(7) as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances."

FAILURE TO PROVIDE ADEQUATE WARNING

(Issue No. 4)
Safway challenges the jury's finding that the scaffold component was unreasonably dangerous for failure to provide an adequate warning, asserting the evidence does not support the jury's conclusion.
La.R.S. 9:2800.57 provides:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:

*849 (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
The LPLA defines "adequate warning" in La.R.S. 9:2800.53(9) as follows:
[A] warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.
The evidence at trial presented the jury with two different theories of an adequate warning. Plaintiffs assert a color-coding scheme would have been a visual warning to a user of the potential dangers associated with unlocked handrails. Plaintiffs also urge a written warning label affixed to Safway's product was necessary. Because the jury may have concluded the scaffolding components manufactured by Safway were unreasonably dangerous for failure to provide an adequate warning based on either the lack of a color-coding scheme or the failure of Safway to affix a written warning label, we examine both bases in our determination of whether there is sufficient evidence to support the jury's conclusion.

A. UNREASONABLY DANGEROUS CHARACTERISTIC
Our initial inquiry is whether the evidence supports the jury's conclusion that at the time the Safway Systems scaffolding left Safway's control it possessed a characteristic that may cause damage.
Jerry Householder, an expert in the fields of construction and civil engineering, testified on behalf of the plaintiffs. Based on Householder's review of brochures from Safway Systems scaffolding and other types of scaffolding, he concluded the main problem with the Systems scaffolding was the difficulty discerning by a casual inspection whether the locking mechanism which holds the handrails [15] into the vertical bars was engaged, and hence, secured. He explained the difference between whether the mechanism was locked or unlocked was the approximately ½ inch travel distance of the wedges. Because of the small travel distance, Householder indicated it would be difficult for any user standing twenty feet below to determine by a visual inspection whether the wedges in the locking mechanism were in the secured position.
From his review of deposition testimony of Safway's director of product safety, Householder noted Safway had conducted various experiments on the locking mechanism of the Systems scaffolding prior to Moore's fall in an attempt to make it more obvious whether the locking mechanism was engaged. Showing the jury a Safway Systems scaffolding locking mechanism, Householder described how Safway had experimented by painting the wedges of the locking pin and by placing decals on those wedges. According to Householder, the purpose of Safway's experiments with color coding was to develop a way to warn users of the Systems scaffolding of the dangers associated with the locking *850 mechanism and to make it easier for the user to discern the status of the locking mechanism. Based on Safway's experimentation, this expert opined Safway knew the dangers associated with unlocked handrails was a problem.
Jack Larks also testified for the plaintiffs. Accepted as an expert in civil structural engineering and in human factors, Larks concluded the Safway Systems scaffolding was dangerous in its normal use because it gave an appearance of safety even when it was in an unsafe condition. Larks explained to the jury that the original prints for the manufacturing of the wedges included information that the wedges were to be colored a yellow dichromate, which would have been a highly visible indicator of the position of the locking mechanism. Larks pointed out during the pre-marketing stage, Safway conducted a test to see how visible the yellow dichromate would make the wedges appear from a distance. Based on Safway's safety literature, Larks was convinced Safway knew there could be a problem for a user trying to determine whether the locking mechanism was engaged, and it also knew loosened handrails could cause serious injury.
David Burkhart, a representative of Safway and an expert in mechanical engineering, conceded the pre-marketing color-testing on the wedges in the pin of the locking mechanism were conducted to make it more visually apparent to the user whether the locking mechanism was engaged.
The testimony of Householder, Larks and Burkhart establishes that at the time the scaffolding assembly left Safway's control the scaffolding component manufactured by Safway was unreasonably dangerous because an adequate warning about the dangers associated with loosened handrails had not been provided. The evidence shows the approximately ½-inch travel distance of the wedges contained within the locking pin made discernment of whether the locking mechanism was engaged difficult from any view point but especially from a distance. The dangers associated with a user encountering an unlocked handrail were also known to Safway at the time the scaffolding left its control. Accordingly, we find the jury's determination was not manifestly erroneous or clearly wrong.

B. REASONABLE CARE
Safway urges because the evidence shows product literature was provided to Jacobs and its employees with each shipment of Systems scaffolding, it used reasonable care to provide an adequate warning. Therefore, it contends the jury's conclusion that its product was unreasonably dangerous because an adequate warning about the scaffolding was not provided is erroneous.
Our examination of the record shows product literature was available to Jacobs; however, the record is devoid of any evidence Moore actually received the product literature. Moore testified he never personally received the product literature while he was working at the Shell plant. The jury apparently concluded Safway did not use reasonable care to provide an adequate warning of the dangers associated with unlocked handrails to users and handlers, and we find ample evidence to support the jury's conclusion.
As noted above, experts Householder and Larks testified the lack of color in the locking mechanism was a deficiency in the Systems scaffolding, and Safway conducted experiments with application of color in an attempt to address the problem. Both Householder and Larks concluded coloration of the wedges contained in the pin of the locking mechanism would have provided a visual warning to users and would have enabled them to see from a distance or a glance whether it was locked.
Based on the testimony of Householder and Larks, the jury may have reasoned that the application of color by decals or paint, or the use of yellow dichromate on the wedges contained in the pin of the locking mechanism, would have readily alerted users of the status of the locking mechanism, and Safway should have incorporated such a method to their product prior to marketing it. In reasoning, the jury may have determined that (1) the coloration of the wedges would have made the status of the lock more apparent such that, as a user, Moore would have *851 known the handrails were unlocked and contemplated the dangers associated with the unlocked handrails prior to climbing the ladder on May 9, 1990, and (2) Safway failed to use reasonable care to provide an adequate warning by not implementing the color coding system. We find a reasonable factual basis exists to support this finding and, therefore, it is not clearly wrong.
However, the jury's conclusion that Safway failed to use reasonable care may have been based on its determination that Safway failed to provide an adequate warning. Safway failed to affix a written label onto the component parts of the Systems scaffolding advising users of the dangers associated with unlocked handrails. The jury may have reasoned an affixed written warning label would have led the user who opened all the locking mechanisms on the top deck of the Systems scaffold to contemplate the dangers associated with unlocked handrails.
Householder testified that warnings need to get the user's attention, put the user on notice of a potential hazard, and suggest or explain to the user how to avoid the hazard. He explained to the jury how studies have shown that where warnings were given to experienced users, accidents were less frequent. The theory behind the studies, according to Householder, is "even people who do the same thing all the time need to be reminded occasionally of things that go wrong." Householder was presented with a different type of scaffolding, also manufactured by Safway, which had a label affixed to each of the individual guardrails and vertical bars stating, "Warning. Unlocked or missing guardrails can cause serious injury or death. Locks slide down, face the guardrail, lock toward platform." Householder thought the warning was a good one, and he did not know why a similar label had not been attached to the component parts of the Systems scaffolding.
Larks' testimony regarding a written warning was in close conformity to that of Householder. Larks explained the component parts of the Systems scaffolding needed a written warning label advising a user that leaving locks open without removing the unlocked handrails was a dangerous practice. In Larks' opinion, even though the Systems scaffolding was typically used by trained scaffold carpenters who handled the product frequently, a warning was still needed on the component parts because frequent users were the very people who tended to become careless when using a product repetitively. Larks explained a written warning label would serve as an ever-present reminder that a hazard existed. Larks noted that while Safway did not affix warning labels to the components of the Systems scaffolding, it did attach instructional labels. He did not know why written warning labels could not similarly be attached. Although Safway provided safety literature with the Systems scaffolding, Larks stated this method of warning was inadequate because it might not reach the ultimate user.
We conclude the jury's determination that Safway failed to use reasonable care because it did not affix written warning labels to its product is supported by the testimony of Householder and Larks and, therefore, is not manifestly erroneous.
In sum, the jury could have reasonably concluded that Safway failed to use reasonable care to provide an adequate warning by either (1) failing to incorporate a color-coding scheme onto the wedges in the locking mechanism; or (2) by failing to affix a written warning label to its product.

C. DUTY TO PROVIDE ADEQUATE WARNING
Safway maintains the evidence shows the Systems scaffolding is not unreasonably dangerous to an ordinary user with the ordinary knowledge common to scaffold carpenters. Safway alleges Moore was an experienced scaffolding builder and the unlocked condition of the handrails was open and obvious, therefore, it had no duty to warn Moore about dangers associated with unlocked handrails. The jury ultimately found Moore was not a user of the scaffolding who already knew or reasonably should have known of the characteristic of the scaffolding which may cause damage and of the dangers of that characteristic, and that the danger to Moore was not open and obvious. *852 Based on the following evidence, we cannot say these findings are clearly wrong.
Householder testified the inspection conducted by Moore prior to climbing the scaffolding ladder to the top deck was in conformity with what users of scaffolding do. According to Householder, a user will look up and make sure everything appears to be in place. In describing his own procedure for climbing up a multi-leveled scaffolding, Householder stated although he looks at the scaffolding, he does not look at every pin, and unless something were readily apparent, he would begin climbing the ladder. In his criticism of the Systems scaffolding, Householder emphasized the deceptive appearance inherent in the locking mechanism of the Systems scaffolding, especially to those users observing from a distance. Householder believed the small travel distance between a locked and secured handrail and an unlocked and very dangerous handrail was not discernible to a competent scaffolding builder with the customary inspection unless the user were close enough to, and specifically looking at, the locking mechanisms.
Based on his experience climbing high levels of scaffolding, J.D. Roberts, a safety expert, testified a user cannot stop and check every locking mechanism within the scaffolding because to do so would be too time consuming and inefficient. Responding to safety material provided to Jacobs with each shipment of scaffolding which advised workers to inspect each locking mechanism of the scaffolding, Roberts explained workers were not paid to engage in the detailed inspection necessary to determine whether the Systems locking mechanism was secured. Roberts stated it was very difficult to ascertain from a distance of eighteen feet whether the handrails were locked. He noted a user eighteen feet in the air would not be concerned with whether a handrail was locked but with how secure the bottom of the scaffolding was.
Kenneth Hughes, Moore's foreman on the day of the accident, explained because the pins only came out a small distance, unless a user were to look closely, he probably would not notice whether the locking mechanism was engaged. In describing the type of inspection ordinarily performed by scaffolding builders, Hughes told the jury when a user is getting ready to climb a ladder, he backs up, looks and then climbs. If a handrail is sitting at the top of a multi-leveled scaffold, Hughes stated, a user would think the handrail is pinned off.
The testimony of Householder, Roberts and Hughes supports the jury's findings that Moore was not a user who knew of the characteristic of the scaffolding which may cause damage and of the dangers of such characteristic and that the danger to Moore was not open and obvious. Accordingly, we find the jury was not manifestly erroneous in reaching these conclusions.

D. CAUSE-IN-FACT
Safway's final assertion challenging the jury's conclusion that it is liable under the provisions of the LPLA for failing to provide an adequate warning is that any breach in its duty to warn was not a cause-in-fact of plaintiffs' damages. We disagree.
As indicated earlier, expert witnesses Householder, Larks and Roberts each concluded coloration of the wedges would have made discernment of whether the locking mechanism was engaged more apparent to users, especially those trying to determine the locking status from a distance. In addition, Moore testified color-coded wedges would have stuck out like a light and would have helped him on the day of the accident by making the wedges more noticeable. Based on the testimony of the expert witnesses and Moore, the jury may have determined that had Safway color-coded the wedges in the locking mechanism, Moore would have noticed the unlocked condition of the handrail and the accident could have been avoided. But for the lack of color-coding, the accident probably would not have occurred.
The jury may also have concluded the failure to affix a written warning label was the cause-in-fact of plaintiffs' damages. As outlined above, Householder and Larks testified the purpose of a written warning label was to alert the actual user of potential dangers. Both expert witnesses agreed even experienced users needed to be reminded of hazards and that a written label would have *853 served such a purpose. Based on that testimony, the jury may have reasoned that affixing a written warning label on the individual components of the scaffolding assembly would have alerted the person who actually released the locking mechanisms of the dangers associated with leaving the handrails on the upper deck of a multi-leveled scaffold in an unlocked condition. Having been warned, that person may have taken a different course of action and circumvented the accident. Accordingly, having determined a reasonable factual basis exists for the jury's conclusions, i.e., (1) the scaffolding components were unreasonably dangerous because an adequate warning was not provided; (2) the danger to Moore as an ordinary user or handler of the scaffolding assembly was not open and obvious, and (3) Moore was not a user or handler of the scaffolding assembly who already knew or reasonably should have known of the dangerous characteristic of the scaffolding, we conclude the jury was not clearly wrong or manifestly erroneous in finding Safway at fault for failing to provide an adequate warning.[16]

ALLOCATION OF FAULT

(Issue No. 6)
The trier of fact's allocation of fault is a factual finding which cannot be overturned in the absence of manifest error. Ly v. State, 633 So.2d 197, 205 (La.App. 1st Cir.1993), writ denied, 93-3134 (La. 2/25/94); 634 So.2d 835. It is only after a court of appeal finds clearly wrong apportionment of fault that it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion; the appellate court should give some deference to the trial court's allocation of fault. Clement v. Frey, 95-1119, p. 5 (La. 1/16/96); 666 So.2d 607, 609-610.
In determining apportionment of fault, the court should consider the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. The factors to be considered include (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
In this case, the jury determined Jacobs was seventy-five percent at fault, Moore and Shell were each five percent at fault, Safway was fifteen percent at fault, and Brand was free of fault in causing plaintiffs' damages. Applying the Watson factors, we examine each of the jury's assessments.

A. Moore
The assessment of five percent of fault to Moore is not manifestly erroneous. Hughes explained that on May 8, 1990, during the dismantling process at the EO2 unit, Moore had been handed component parts of the scaffolding system from a fellow crew member working on the top deck. Moore in turn handed these parts to another employee who then piled them onto the bed of a pick-up truck. While Moore certainly did not perceive the danger he was exposed to on May 9, 1990, as he reached from the ladder to the handrail trying to access the platform of the top deck, Moore should have recalled assisting his co-employee the day before and proceeded more cautiously. As Moore ascended the ladder, the distance between him and the locking mechanisms of the handrails lessened, which made the ½-inch travel distance of the wedges easier to discern. Aware another member of the crew had commenced dismantling of the scaffolding on the top level, Moore should have checked the locking mechanisms as he climbed up the ladder, particularly those associated with the handrail he grabbed onto as he reached the *854 top deck, and possibly discovered the loosened status of the handrails. Accordingly, we find a reasonable factual basis exists to support the five percent assessment of fault to Moore by the jury.

B. Shell
Before Jacobs could access the EO2 unit to dismantle the scaffolding, Shell required that a Shell employee inspect the area. Only after Shell issued a work permit could the Jacobs crew enter the EO2 unit area. The purpose of a safety inspection by Shell was to avoid unsafe conditions like the very one which led to Moore's fall. Although a person looking from a distance would have difficulty discerning whether the locks of the handrails of this scaffolding assembly were engaged, the Shell operator who was purposefully inspecting the EO2 unit area certainly should have looked for such a hazard.
The record also shows Shell's procedure of prioritizing Jacobs' work projects precluded Jacobs supervisors from competently overseeing their crew. At Shell's direction, the Jacobs crew supervisor working on an "A" ticket project was to advise the crew members to stop working and to attend to a higher priority "E" ticket project. This frequently involved relocating the Jacobs employees to another area of the Geismer plant. This disruption in Jacobs' work process may have been a factor in the failure to advise Moore of the unlocked status by the co-employee who loosened the handrails. An assessment of five percent fault against Shell for its negligence is not clearly wrong.

C. Safway
The jury's allocation of fifteen percent of fault to Safway is likewise supported by the record. As discussed earlier, Safway knew unlocked handrails were dangerous to users and handlers of its product. Safway conducted experiments with the application of color prior to marketing the Systems scaffolding. Safway affixed instructional labels to the component parts of this system but did not choose to include a written warning label on the component parts regarding the dangers associated with unlocked handrails. The evidence established Safway attached such written warning labels on component parts of other scaffolding assemblies. In light of the versatility and uniqueness of the Systems scaffolding, Safway realized the structures being built by users and handlers could rise to great heights and serious injuries could result from a user's failure to properly secure the locking mechanisms of the Systems scaffolding. As the manufacturer of the Systems scaffolding, Safway should have addressed problems relative to the locking mechanism that it clearly knew existed prior to marketing its product. The allocation of fifteen percent of the fault to Safway is not clearly wrong.

D. Brand[17]
Plaintiffs asserted Brand, as the exclusive distributor of Safway scaffolding, was negligent for failing to assure safety literature was received by those users actually assembling and disassembling the scaffolding system. However, the record contains no evidence showing Brand to be the exclusive distributor of Safway scaffolding. Moreover, the overwhelming evidence established that every time a shipment of Safway scaffolding was sent to Shell by Brand, the safety literature was included. The record contains no evidence establishing Brand was aware of defects in the safety literature. Apparently the jury concluded Brand used reasonable care to provide the requisite information needed to warn of the dangers associated with loosened handrails to its customers and lessees. We cannot say the jury was manifestly erroneous in exonerating Brand from liability.

E. Jacobs
The testimony of Jacobs' field foreman, Hughes, established that a member of the Jacobs crew, acting pursuant to a work *855 order to dismantle the scaffolding at the EO2 unit, was the only employee to access the top deck of the scaffold on the day before Moore was injured. The failure of the Jacobs employee to communicate to other members of the crew that he had loosened all of the handrails on the top deck of the multi-leveled scaffold upon cessation of work for the day created a great risk, not only to Moore who was ultimately harmed, but also to other Jacobs personnel and any other person who may have attempted to utilize the scaffolding. It is doubtful the Jacobs employee who loosened the handrails intended to cause harm; however, he should have either effectively communicated his actions or not undertaken the loosening of all the handrails on a deck for which the dismantling process could not be completed.
We find the fact that Jacobs began the dismantling project on May 8, 1990, significant. The entire scaffolding assembly could not be dismantled before the end of the day. According to Hughes' testimony, a Jacobs general foreman determined which project its employees would work on and the order in which projects would be attended to by its crews. Jacobs knew or should have known the time necessary to dismantle the scaffolding assembly and should have taken that into consideration when assigning projects to its employees. Moreover, nothing in the record evinced an operational procedure established by Jacobs to alert members of its crew of the potential dangers associated with a scaffolding assembly despite testimony by Hughes that crews were frequently reassigned during disassembly projects to other higher-priority projects of erecting scaffold. Based on our review of the evidence, we find the jury's allocation of seventy-five percent of the fault to Jacobs is not manifestly erroneous.
Accordingly, we find reasonable factual bases exist for the jury's assessments of fault.

QUANTIFICATION AND REAPPORTIONMENT OF EMPLOYER FAULT

(Issue No. 1)
At the time of this trial, during July 1994, Gauthier v. O'Brien, 618 So.2d 825 mandated the jury quantify the fault of employers who were immune from tort liability under the provisions of La.R.S. 23:1032.[18] Although the jury's written response to interrogatory No. 15 on the verdict form indicated the jury found Moore and Shell each five percent at fault, Safway fifteen percent at fault, and Jacobs seventy-five percent at fault, the trial judge re-distributed the fault attributed to Jacobs by the jury in accordance with Gauthier. Thus, Moore and Shell were each held twenty percent at fault with the remaining sixty percent of the fault attributed to Safway.[19] Plaintiffs, Shell and *856 Safway assert the trial court erred in applying Gauthier to reapportion the fault of Charles Moore's employer, Jacobs.
In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95); 657 So.2d 975, the Louisiana Supreme Court addressed the issue of whether a jury is required to quantify employer fault in tort cases. The Cavalier court held jury quantification of employer fault is neither necessary nor appropriate under La.C.C.P. art. 1812(C)(2), in actions against third party tortfeasors, overruling its previous holding in Gauthier that such quantification was mandatory.[20]Cavalier, 94-1496 at pp. 9, 11; 657 So.2d at 981-982.
Plaintiffs, Shell and Safway each assert because the trial judge reapportioned fault in accordance with Gauthier, he committed legal error. Plaintiffs suggest no more than the five percent of fault (the amount actually attributed to Moore by the jury) should be assessed against Moore, with the remaining ninety-five percent of fault distributed among Shell, Safway and Brand. Shell and Safway each suggest the legal error requires a new trial; alternatively, both defendants request we conduct a de novo review.
In Cavalier, the Supreme Court stated:
Although we now hold that quantification of employer fault is unnecessary and inappropriate, the jury did in fact quantify the employer's fault in the present case. It is therefore necessary to strike that portion of the jury's verdict which erroneously quantified employer fault and assess liability without regard to the employer or to the percentage of fault attributed by the jury to the employer.
In Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991), after the jury had erroneously quantified employer fault, this court determined the proportionate degrees of fault between the contributor[ily] negligent plaintiff and the third party tortfeasor, and assessed liability accordingly. In the present case, the plaintiff was not contributorily negligent, and there was only one third party tortfeasor. Since the jury should not have been instructed to quantify employer fault and since Cain's was the only blameworthy party or released person to whom any degree of fault was properly quantified, Cain's is liable for one hundred percent of the tort victim's damages. (Footnote omitted.)
Id. at 984.
Applying the principles enunciated in Cavalier, and followed by this court in Stockstill v. C.F. Industries, Inc., 94-2072 (La.App. 1st Cir. 12/15/95); 665 So.2d 802, we find it is necessary to strike that portion of the jury's verdict which erroneously quantified employer fault and to assess liability without regard to the employer or to the percentage of fault attributed by the jury to the employer. See Cavalier, 94-1496 at p. 14; 657 So.2d at 984; Stockstill, 94 2072 at p. 17; 665 So.2d at 816; see also Guidry, 579 So.2d at 954. Because the jury's verdict erroneously quantified employer fault, we must determine the proportionate degrees of fault applicable to the blameworthy parties. See Cavalier, 94-1496 at p. 14; 657 So.2d at 984; Stockstill, 94 2072 at p. 17; 665 So.2d at 816; see also Guidry, 579 So.2d at 954.
The inference we draw from Cavalier is it error for the jury to fix the amount of employer fault, but once this has been done an acceptable way of correcting the error is to extrapolate the amount of fault attributed to the non-party employer and, using proportions, to re-distribute that fault among the remaining blameworthy parties. This was the method employed by the line of cases represented by Guidry and reinstated by Cavalier. This method is probably as accurate as any other in allocating fault, which by *857 its very nature is more a matter of judgment than an exact science, and has the added advantage of preserving as much as practical the reasoning used by the jury which, after all, was in the best position to weigh the fact issues. Ventress v. Union Pacific Railroad Co., 95-1240, p. 17 (La.App. 4th Cir. 12/28/95); 666 So.2d 1210, 1220, reversed in part, 96-0501 (La. 5/3/96); 672 So.2d 668.[21]
Using the ratio approach described in Guidry, 579 So.2d at 954, and cited with approval in Cavalier, 94-1496 at pp. 14-15; 657 So.2d at 984, and Stockstill, 94 2072 at p. 17; 665 So.2d at 816, Moore's fault is increased to twenty percent, Shell's fault is increased to twenty percent and Safway's fault is increased to sixty percent. Because this result is the same as that reached by the trial judge, we find these assignments of error are without merit.[22]

QUANTUM OF DAMAGES

(Issues No. 7 and 15)
The trier of fact is given much discretion in the assessment of damages. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. La.C.C. art. 2324.1; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In reviewing an award of damages, an appellate court should not rely on a comparison of other awards in other cases to determine if a particular award is appropriate. A comparative analysis should be undertaken only after the appellate court has found an abuse of discretion. In Youn v. Maritime Overseas Corp., 623 So.2d at 1260, citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the court stated: "Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion."
Safway and Shell urge the jury's damage awards were abusively high, and Shell has adopted and joined in Safway's argument.[23] *858 They argue the awards for the following items of damage were contrary to the weight of the evidence and the law: past and future pain and suffering, future medical and prescription expenses, future lost earnings, loss of consortium to plaintiff, Verna Moore, and loss of society for Ray Moore. Additionally, plaintiffs contend the jury's awards for future pain and suffering and for future medical expenses are inadequate. We now examine each of the challenged items of damage to ascertain whether the jury abused its discretion in making these awards.

A. PAIN AND SUFFERING
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir. 5/5/95); 655 So.2d 431, 437. The factors to be considered in assessing quantum for pain and suffering are severity and duration. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir. 11/10/94); 647 So.2d 351, 357.
The jury awarded $500,000 for past pain and suffering, mental anguish, and physical and mental disability; and $500,000 for future pain and suffering, mental anguish, and physical disability. Moore's injuries were extensive. When Moore fell approximately twenty feet, his face and the right side of his body hit a concrete floor. Moore recalled throwing up blood and having his clothes cut off of him just before he became unconscious and was taken to the hospital.
Moore had multiple fractures of the face and a basilar skull fracture (a fracture at the base of the brain) which causes problems with hearing and balance. He also suffers from tinnitus (a high pitched sound) in the right ear. Moore has a mild hearing loss in his left ear, and his right ear has been diagnosed as a "dead ear," without possibility of hearing recovery. His balance problems include vertigo and frequent bouts of dizziness. In addition, Moore sustained brain damage, which impairs his orientation, memory, and judgment. Moore was diagnosed as clinically depressed by his clinical psychologist, Dr. Craig Waggonner. Dr. Eleanor Bell Cannon, another clinical psychologist and an expert in neuropsychology, diagnosed Moore with organic brain disorder. Dr. Waggonner opined that Moore's impaired impulse control, weak behavioral control, poor judgment, inability to handle life's normal stresses, inability to encode new information, inability to solve new problems and inability to trust other people will always exist due to his head injuries.
Dr. James Robertson, a neurologist, testified via deposition. After conducting a full neurological exam, Dr. Robertson indicated Moore had many symptoms characteristic of post-concussion syndrome. These included headaches, insomnia and irritability, accompanied with dizziness. Dr. Robertson testified Moore displayed a great deal of paranoia and suspiciousness, and although he expected similar symptoms in most head injury patients, Moore exhibited more than usual. Moore has mild to moderately severe memory loss. He has been placed on anti-seizure medication due to a history of seizure activity. According to Drs. Robertson, Waggonner and Cannon, the severity of the symptoms associated with postconcussion syndrome and damage to the brain were not likely to improve beyond the level Moore was demonstrating on the date of trial (approximately four years post-accident). Dr. Robertson did not believe surgical correction would be possible.
Moore also suffered a perforated nasal septum for which he underwent surgery and has lasting complications. He may require additional surgery. The fall also caused Moore to sustain fracture-dislocations of both *859 his mid-feet, which required surgical replacement. Moore's kneecap was so shattered from the fall, it was removed. Moore could not walk for several months, and then only after extensive physical therapy and a subsequent home program of physical therapy. Moore broke several teeth and fractured the hard palate in his mouth. He has ongoing temporomandibular joint (TMJ) pain which Dr. Joel Safer, a dentist and oral surgeon, suspects will be life-long. Moore experienced radiculopathy, i.e., radiating pain caused by a slipped disc in his lower back pressing on the nerve. Moore was diagnosed with carpal tunnel syndrome on his right side and also sustained a herniated disc which were related to the May 9, 1990 accident by Dr. Robertson.
Based on the extent and severity of his injuries and the testimony of his physicians and psychologists regarding the ongoing complications he experiences, we find no abuse in the jury's vast discretion in either the award for past or future pain and suffering.

B. FUTURE MEDICAL AND PRESCRIPTION EXPENSES
A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of an injury. However, a plaintiff must prove the existence of the injuries and a causal connection between those injuries and the accident. The test is whether plaintiff has shown through medical testimony that more probably than not the subsequent medical treatment was necessitated by the trauma suffered in the accident. White v. Longanecker, 93-1122, p. 9 (La.App. 1st Cir. 5/23/94); 637 So.2d 1213, 1218, writ denied, 94-1704 (La. 10/7/94); 644 So.2d 640. When the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. Richard v. St. Paul Fire and Marine Ins. Co., 94-2112, p. 11 (La.App. 1st Cir. 6/23/95); 657 So.2d 1087, 1093.
The jury awarded the lump sum of $1,887,225 for future medical expenses and future prescription drugs. Safway and Shell suggest the award is excessive and should be reduced. Plaintiffs urge the award is abusively low and should be increased.

1. Future Medical Expenses
Robert E. Voogt, a rehabilitation expert, was trained to provide counseling to help people adjust to a disability. He works with the families and those suffering a disability to construct a life care plan which enables the achievement of specific goals. With a brain injured person, Voogt testified, the goal is to make the person as safe as possible and to provide an environment that allows them to be productive. Voogt coordinates the services of various professionals and, based on research acquired by his staff as to the exact costs of services, he compiles the information into a life care plan. In conjunction with preparing the life care plan presented for Moore, Voogt's staff called Moore's medical care providers to inquire about the cost of the services provided by each. He then calculated the future cost based on the frequency of care that each of Moore's health care providers indicated was needed.
Voogt understood Moore could not be left alone and described how the family would become baby-sitters. Voogt presented calculations based on twenty-four hour attendant-care and, alternatively, calculations based on Moore's commitment to a long-term care facility. He explained Moore would not require both. Voogt testified the annual costs for a home-based attendant-care program would be $114,319 the first year and $112,982 for each subsequent year. The annual costs for a long-term care facility, based on Voogt's calculations, would be $120,270 per year. G. Randolph Rice, an expert in the field of economics, testified via deposition. Rice calculated Moore's life expectancy to be an additional 35.9 years, as of the date of trial. Voogt noted his calculations were based on the ongoing medical and dental care, as well as therapeutic evaluations. Additionally, the costs of equipment necessary to Moore's *860 medical maintenance were factored into Voogt's determination.

2. Future Prescription Drugs Expenses
Harvey Rappaport, an expert in the field of pharmacy, testified if Moore lived a life expectancy of an additional 36 years, approximately $2,000,000 would be needed for the costs of his prescription drugs. Rappaport explained that in making his calculations, he included only those drugs used on a monthly basis, he used the actual price Moore had paid for each drug; and he multiplied that cost times twelve months to determine the annual costs. In projecting the cost over thirty years, Rappaport classified each drug based on the indications for use and reviewed the annualized increase in price for that class of drugs. He stated the underlying assumption of his calculations was the drugs would continue to increase at the same rate they had in the previous twelve years.
Based on the foregoing evidence, we find the jury did not abuse its vast discretion in awarding $1,887,225 for the combination of future medical expenses and future prescription drug expenses.

C. FUTURE LOST EARNINGS AND EARNING CAPACITY
Damages for loss of future earnings or future earning capacity should be based on the injured person's ability to earn rather than what was actually earned before the injury. Jenkins v. State, Dept. of Transp. and Dev., 619 So.2d 1188, 1201 (La. App. 1st Cir.1993), writ denied, 625 So.2d 1058 (La.1993). A loss of future earning capacity award is not predicated merely upon the difference between a plaintiff's earnings before and after a disabling injury, but also encompasses the loss of one's earning potential or capacity, i.e., the loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience, and for which he may receive recompense. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured person could have earned despite the fact that he may never have seen fit to take advantage of that capacity, if the injury has deprived him of a capacity he would have been entitled to enjoy, even though he never profited from it. Thibodeaux, 93-2238 at pp. 15-16; 647 So.2d at 360.
Safway and Shell assert the jury abused its discretion in its award of $453,000 for future lost earnings and earning capacity. Drs. Hansbrough, Waggonner and Cannon testified that Moore would not be able to return to work. G. Randolph Rice, testified that based on his calculations, Moore's work life expectancy was 21.3 years. Assuming Moore received no promotions, a lump sum of $669,288 would have had to have been set aside as of the date of trial to replace what Moore would otherwise have earned, according to Rice. Rice also calculated an additional sum of $160,955 would be needed to replace lost fringe benefits. Kenneth Boudreaux, also accepted as an expert in the field of economics, testified on behalf of the defendants. He calculated Moore's work life expectancy at 21 years on the date of trial. Based on Boudreaux's calculations, Moore's lost future earnings would be between $207,000 and $270,000. In light of the wide range of figures presented by the experts and particularly the testimony of Rice, we conclude the jury did not abuse its discretion in awarding Moore $453,000 for lost future earnings and earning capacity.

D. LOSS OF CONSORTIUM AND LOSS OF SOCIETY
An award for loss of consortium is properly made where there has been some measurable or compensable loss, such as loss of love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. Haley v. McManus, 593 So.2d 1339, 1344 (La.App. 1st Cir.1991). The elements of a minor child's claim for loss of service and society are essentially the same without, of course, the sexual component. Higley v. Kramer, 581 So.2d 273, 282 (La.App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991).
Applying these precepts to the instant case, we find no abuse of the jury's discretion in awarding $200,000 to Verna Moore for loss of spousal society, service and *861 consortium; and $50,000 to Ray Moore for loss of his father's society and services.
Drs. Robertson and Cannon discussed the impact the victims of head injuries have on their families. Dr. Cannon explained the disability becomes the focus of the family and disrupts children's development. Dr. Cannon also noted the major caretaker, in this case Verna Moore, is restricted for a long time. Dr. Robertson stated the irritability and paranoia always affect the family because it is those closest to the victim who receive the brunt of the irritability in a direct fashion.
Charles and Verna Moore were married in 1976 and have one son, Ray. Verna testified that immediately after the accident, Charles did not look like himself due to the severity of his injuries. Mrs. Moore described in detail the disruption to their lives that the injuries have had, explaining how a regular bed would not accommodate Charles when he was released from the hospital and how she had to acquire a used hospital bed to set up in the living room. Mrs. Moore attended to all of Charles' personal needs, including bathing her husband daily. She told the jury how his impaired ability to smell frequently convinced Charles he needed yet another bath. Verna Moore testified she does not leave Charles unattended. Because he no longer can drive a car outside a very limited area in close proximity to their home, Verna has accompanied Charles to almost every medical appointment. She described two incidents in which Charles was left unattended and how harm resulted. Because Charles can no longer cut the grass in the yard, paint the house or chop firewood for their wood heater, Verna has assumed those duties. Mrs. Moore indicated the couple could not engage in sexual relations for the first six months following the accident. She also explained how taking care of Charles has limited her time and ability to attend to her son.
Immediately after the accident, Ray began having difficulty in school. He was unable to pass the fifth grade and had to repeat that grade level. As of the date of trial, although he was doing better in school, he was still significantly below his level of accomplishment prior to his father's accident. Furthermore, Charles' depression and impulsive behavior was traumatic for Ray at times. Often Charles did not remember events or understand the consequences of his behavior. For example, Verna related a story about Ray, Charles and Charles' baby chickens. Charles and Ray were alone one day for a short period. Verna returned home to find dead baby chickens in the back yard. Charles had impulsively killed the baby chickens in front of Ray for no apparent reason. Ray apparently had screamed for Charles to stop, but Charles did not. Later, when questioned about his conduct, Charles could not recall the incident. In light of the testimony of the psychologists and Verna Moore as to the impact of Charles' injuries on the daily life of the Moore family, we find no abuse of the jury's vast discretion in either the loss of consortium award to Verna Moore or the loss of society award to Ray.

INTEREST ON DAMAGES FOR FUTURE LOSSES

(Issue No. 5)
In its final contention, Safway argues the interest on damages for future losses should run from the date of judgment and assigns error to the trial court's award of interest on all damages from the date of judicial demand. Although Safway's argument is persuasive, and perhaps should be addressed by the legislature, we find no error in the trial court's judgment. La.R.S. 13:4203; See Sharkey v. Sterling Drug Inc., 600 So.2d 701, 718 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La.1992).

CONCLUSION
For the reasons expressed herein, we affirm the judgment of the trial court. The costs of this appeal are assessed one-half to Safway and one-half to Shell.
AFFIRMED.
SHORTESS, J., concurs with reasons.
PARRO, J., dissents and assigns reasons.
*862 SHORTESS, Judge, concurring.
This case has many legal facets and though I agree with the majority's end result, I write separately to address the "duty to provide a safe work place" issue affecting Shell's independent negligence. In Shell's contract with Jacobs which provides Shell with the option of inspecting any area where Jacobs' employees are working, the applicable inspection clause reads, in part:

All equipment, machinery, apparatus, materials, and supplies used or to be used in performing the contract, and all work performed by Wiese [Jacobs' predecessor] hereunder shall be subject to inspection by Shell's representatives....
(Emphasis added.) So Shell was not contractually required to inspect the work area on the day Moore fell. However, the majority correctly notes that when the Shell operator walked out of his office and "looked around" the EO2 unit area that day (a precursor for issuing work permits), Shell affirmatively exercised its option to inspect. By exercising this option, Shell implicitly became obligated to inspect the work area in a reasonable manner. Crane v. Exxon Corp., 613 So.2d 214, 221 (La.App. 1st Cir.1992), amended on other grounds, 633 So.2d 636 (La.App. 1st Cir.1993). This obligation to inspect in a reasonable manner affects Shell's duty to provide a reasonably safe work place. If Shell exercised its inspection rights and did so in an unreasonable manner, it would have breached its duty. However, Shell could inspect some structures in a reasonable manner and still have breached its duty. So, how far does Shell's duty to provide a safe work place extend?
Shell contends the above obligation (duty) did not extend to the inspection of scaffolding, a trade in which Shell admits it lacked expertise, and a reason it contracted with Jacobs. Shell argues its duty to provide a safe work place was limited only to hazards associated with, or dangers emanating from, the permanent plant structures (e.g., the production facilities such as vessels, pipes, pressure valves, wires, etc.). For example, Edward Lagucki and Jeff Hall, Shell's maintenance employees, both explained it was the Shell operator's job, when issuing a work permit, to inspect the "process conditions in the area" for hazards. The unsafe conditions Shell attempted to detect before issuing a work permit were limited in scope to unsafe conditions from the plant "processes." Providing a safe work place, according to Hall, meant "inspect[ing] the area on a regular basis to assure that from a process standpoint everything was in a safe and working condition" (emphasis added). Lagucki testified, "The operators will go out and assure that the area is safe to work in from an operability standpoint, that there is no leaks..." (emphasis added). He continued explaining that the purpose for issuing work permits did not "have anything to do with supervising scaffold building." In sum, Shell narrowly construes its obligation to provide a safe work place by arguing it is responsible only for dangers relative to the plant structures containing the chemical processes, not any dangers associated with a subcontractor's equipment, machinery, apparatus, or materials.
Nevertheless, Shell's argument is unpersuasive in light of the contract's plain language. The contract specified all equipment, machinery, apparatus, and material. If Shell chose to inspect the work area, it had to do so in a reasonable manner, and under the contract, this means the whole work area, including any of its subcontractor's equipment, machinery, apparatus, and materials. Scaffold building was included within the contractual scope of Shell's inspection duties. Shell's inspection of the work area was not reasonable because it failed to inspect the unsafe scaffolding.
Furthermore, I decline to adopt Shell's distinction between Shell "processes" and scaffold building. A work area includes all directly related operations needed to accomplish the main task. Without the scaffold at the EO2 unit, Shell would not have been able to conduct preventative maintenance. Shell's duty to provide a safe work place encompasses all potential dangers from its own permanent structures and from the tools needed to conduct regular and special maintenance as well. It applies to all employees in the area. Shell also knew the work on the accident date involved dismantling the scaffolding. *863 Shell should not escape liability by claiming the scope of its duty was limited to some already existing structures and not to others required to perform maintenance within the same area. This duty does not exist in a vacuum. Its scope will expand and contract depending on the work circumstances. In this case, it encompassed the danger of loosened scaffold hand rails. To let Shell maintain such a narrow and inflexible view of its duty would let Shell ignore dangers in the work area which, as owner of the premises, it should and could prevent. Shell wonders why plaintiff expected it to detect the danger when plaintiff himself was more experienced and should have been aware of the loosened hand rail. Shell is correct; plaintiff does bear some fault. Even though an experienced scaffold carpenter like plaintiff failed to detect the dangerous condition, his omission does not absolve Shell from its underlying obligation of attempting to correct unsafe conditions in the area. Shell, too, should have been aware of the danger. Since the Shell operator was not trained to inspect scaffolding, Shell should have had someone on site who was trained in scaffold inspection for such circumstances. It cannot rely on Jacobs alone when Jacobs is performing work on Shell's property.
Lastly, the relationship between Crane and the result here must be mentioned. In Crane, this court found Exxon independently negligent because its employee spent an hour each day monitoring the progress of the job. Thus, it assumed its duty to inspect, and we found its employee failed to do it in a reasonable manner. Similarly, the Shell operators issuing work permits would inspect the work area whenever a subcontractor asked to work in that area. In both situations, Exxon and Shell intended to inspect for unsafe conditions. In Crane, the Exxon employee was more versed in all possible hazards which may occur and just failed to perform adequately. Though the Shell operator allegedly did not know to inspect scaffolding, was not trained to inspect it, nor did so, Shell should have informed its employees their inspection duties included inspecting scaffolding and should have trained them to inspect it. Shell alternatively could have hired a safety foreman already versed in scaffold inspection instead of training its own personnel. Either way, Shell should not passively ignore its obligation to look for all potential hazards relative to the whole work processes  not only the permanent structures but the tools and equipment necessary to perform maintenance within its work areas. As owner, with a contractual option which it exercised, Shell cannot escape this responsibility (five percent assignment of fault, increased to twenty percent pursuant to the Gauthier v. O'Brien ratio analysis  the same as plaintiff).
For these reasons I respectfully concur.
PARRO, Judge, dissenting.
Although I disagree with other aspects of the majority opinion, I limit my dissent to the proper classification of the jury verdict form and the propriety of the trial court's action upon receipt of the jury's initial verdict. The majority has seemingly classified the form used in this case as a general verdict form and has applied the provisions of LSA-C.C.P. art. 1813 in reviewing the actions of the trial judge with respect to inconsistencies between the answers to certain interrogatories and the so-called general verdict. Since there is no general verdict in my view and the verdict form used contained special written interrogatories on each issue of fact, I believe the jury returned a special verdict pursuant to LSA-C.C.P. art. 1812. Therefore, I take the position that the majority erred as a matter of law in applying LSA-C.C.P. art. 1813.
Nevertheless, the majority's improper classification of the verdict form in this case is not crucial. Under the following analysis, it would not matter if the form was a special verdict form pursuant to LSA-C.C.P. art. 1812 or a general verdict form accompanied by written interrogatories pursuant to LSA-C.C.P. art. 1813.
With respect to the verdict form as to Safway, the jury found the scaffolding component or components were not defective in design in answer to interrogatory number one. Although the jury in answer to interrogatory number three found the scaffolding component or components were unreasonably *864 dangerous because an adequate warning had not been provided, the jury determined that Charles Moore ("Moore") was a user or handler of the scaffolding who already knew or reasonably should have known of the characteristic of the scaffolding that may cause damage and the danger of such characteristic. This determination was made in its response to interrogatory number five. Despite the jury's finding regarding the unreasonable danger created by the absence of an adequate warning, LSA-R.S. 9:2800.57(B)(2) alleviated any duty Safway might have had to provide an adequate warning since Moore was a user or handler who already knew or was reasonably expected to have known of the characteristic of the product that caused damage and the danger of such characteristic. Thus, in response to the special interrogatories (one through five) pertaining to Safway's fault, the jury concluded that Safway was not at fault.
In response to interrogatories numbers six and eight, the jury found that Brand's and Shell's personnel were not negligent. The only defendant the jury found to be at fault was Jacobs. After specifically finding that neither Safway nor Shell were at fault or liable for Moore's injuries, the jury in responding to interrogatory number fifteen assigned percentages of fault to Safway and Shell. This interrogatory specifically instructed the jury to "state the percentage of fault, if any, to be attributed to each party that you have found at fault." Fault shall be apportioned only after the fault of each party and causation have been established. See Thompson v. Colony Insurance Company, 520 So.2d 1158 (La.App. 3rd Cir.1987); Efferson v. State, Department of Transportation and Development, 463 So.2d 1342 (La.App. 1st Cir.1984), writs denied, 465 So.2d 722 (La.1985). Where a party is found not to be at fault, the apportionment of fault as to that party is not an issue for the trier of fact. See Fontenot v. State, Department of Education, 92-132 (La.App. 3rd Cir. 4/6/94), 635 So.2d 627, writ denied, 94-1131 (La. 6/24/94), 640 So.2d 1350. Since the jury only found fault as to one defendant (Jacobs) in responses to interrogatories numbers one through eleven, the jury erred in assigning any percentage of fault, other than zero, to Safway or Shell.
In light of the jury's responses to the individual interrogatories pertaining to the fault of each party, I feel the trial court had no authority to return the jury for further deliberations. Rather, it should have rendered a judgment in conformity with the jury's answers to these special written questions and according to the applicable law as required by LSA-C.C.P. art. 1812(D).
A review of the record establishes a reasonable factual basis to support the jury's determinations that (1) Safway did not have a duty to provide an adequate warning as to Moore since he was a user or handler who already knew or was reasonably expected to have known of the characteristic that caused damage and the danger of such characteristic and (2) Shell's personnel were not negligent. Furthermore, the record establishes the jury's factual determinations as to Safway's and Shell's fault were not manifestly erroneous.
In the absence of a finding of fault as to Shell, a determination of whether Shell was a statutory employer is irrelevant. Therefore, I would have concluded that Moore's recovery is limited to his claim for workers' compensation. For these reasons, I would reverse the judgment of the trial court and dismiss Moore's tort action. Accordingly, I respectfully dissent.
NOTES
[1] La.R.S. 23:1021-1415.
[2] In their original petition, plaintiffs incorrectly identified Figgie International, Inc., Safway Division as "Safeway, Inc." Although plaintiffs subsequently amended their petition to properly identify this party defendant, the caption remains unchanged.
[3] The Jacobs crew was working on an assembly that Safway had named "Systems scaffolding."
[4] On July 14, 1992, the plaintiffs amended their petition to include a loss of consortium claim on behalf of their minor son, Ellis Ray Moore. The amended petition also identified Figgie International, Division of Safway, as the correct name of the manufacturer of the alleged defective product and named Brand (rather than its predecessor as cited in plaintiffs' original petition) as a defendant.
[5] Neither plaintiffs nor Shell have raised on appeal the propriety of the trial court's decision to return the jury for further consideration of its answers and the verdict.
[6] Although on appeal Shell does not raise issue with the trial judge's instructions advising the jury of an inconsistency between interrogatory No. 8 and the verdict, it suggests the assessment of five percent fault to Shell was an attempt by the jury to apply custodial liability under the provisions of La.C.C. art. 2317 to the facts of this case.
[7] Safway styled its assignment of error so as to challenge the trial court's failure to grant its motion for judgment notwithstanding the verdict based on the trial judge's alleged errors of not accepting the verdict of the jury, instructing the jury and returning it for post-verdict consideration. However, Safway did not brief the alleged error insofar as it relates to the trial court's denial of the motion for judgment notwithstanding the verdict. Therefore, we consider it abandoned. See Uniform Rules of Louisiana Courts of Appeal Rule 2-12.4.
[8] Shell filed a motion for summary judgment seeking dismissal from this lawsuit on the basis of the statutory employer defense which was denied by the trial court on March 10, 1994. On July 18, 1994, in docket No. 94 CW 0973, this court denied Shell's application for a supervisory writ.
[9] We conclude the Supreme Court's holding in Kirkland merely establishes the meaning § 1061 had from the time of enactment, and as such, is to be given retroactive effect. See Rousselle v. Plaquemines Parish School Board, 93-1916 (La. 2/28/94); 633 So.2d 1235, 1244.
[10] See the "integral relation" test established in Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950).
[11] This interrogatory reflects the "integral relation" test established in Thibodaux v. Sun Oil Co., 49 So.2d 852.
[12] We find no merit in Shell's contention that the trial court erred by denying its motions in limine seeking to exclude evidence relative to the Berry factors. (Issue No. 8) Shell asserted the 1989 amendment to § 1061 legislatively overruled the Berry factors, thus, any evidence relative to those factors was irrelevant. In light of the factors discussed by the Supreme Court in Kirkland, we find no error in the trial court's ruling on the motions in limine.

Additionally, Shell maintained the trial court erred in charging the jury. (Issue No. 9) Shell suggested the trial court should have advised the jury of the Berry factors and then further charged that the Berry factors were irrelevant to the determination of whether Shell was Moore's statutory employer. The holding in Kirkland makes it clear that evidence relative to the Berry factors is still pertinent. We find the trial court, having charged the jury relative to the amended version of § 1061, properly instructed the jury.
Lastly, because we have examined the evidence de novo, we pretermit Shell's assertion that the trial court erred in denying Shell's motion for judgment notwithstanding the verdict. (Issue No. 11)
[13] Article XIV of the contract which was titled "Inspection" provides, in pertinent part: "All equipment, machinery, apparatus, materials, and supplies used or to be used in performing the contract, and all work performed by [Jacobs] hereunder shall be subject to inspection by Shell's representatives, who shall at all times have access thereto whether on the plant site or elsewhere."
[14] Shell assigned as error the trial judge's failure to instruct the jury that the issuance of work permits by Shell to employees of independent contractors and the requirement that those employees abide by Shell's safety rules do not constitute operational control. Because Shell did not brief the assignment of error, we consider it abandoned. See Uniform Rules of Louisiana Courts of Appeal Rule 2-12.4.

Shell also assigned as error the trial court's ruling permitting the admission of evidence of alternative tagging procedures, asserting such evidence was irrelevant. Because we have concluded the jury's finding that Shell was negligent is supported by the evidence without relying on any of the evidence relative to alternative tagging procedures, we pretermit a discussion of whether the admission of such evidence was erroneous.
[15] Apparently within the scaffolding trade, guardrails encompass both midrails, which run horizontally at knee level and handrails which run horizontally at waist level. We note the guardrail which Moore grabbed onto at the time of his fall was a handrail. Thus, throughout the opinion we focus our attention on handrails and, at times where it is not critical to the analysis, we use the term handrails to include midrails.
[16] Plaintiffs have assigned error to the jury's finding that the Systems scaffold component was not defective in design. (Issue No. 14) Because we have found no error with the jury's determination that Safway is liable for plaintiffs' damages for its failure to provide an adequate warning about its product, it is unnecessary to address this alternative basis of liability, and we pretermit such a discussion.
[17] As discussed earlier, plaintiffs failed to timely object to the exclusion of interrogatories on the verdict form addressing custodial liability of the defendants under the provisions of La.C.C. art. 2317. Therefore, the jury's exoneration of Brand from liability must be reviewed solely to determine whether a factual basis exists for finding Brand was not negligent under the provisions of La.C.C. art. 2315.
[18] We note by Act No. 3 of the 1996 First Extraordinary Session, the legislature amended La. C.C. art. 2323, to provide in pertinent part:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's ... immunity by statute, including but not limited to the provisions of R.S. 23:1032....
The effective date of Act No. 3 was April 16, 1996. The plain language of the provisions of the amended statute do not indicate whether the legislature intended it be given retroactive application. However, without ruling on its retroactivity, we note if we were to apply the amended statute to the facts in this case, the jury's quantification of employer fault in accordance with Gauthier is the same method required under the provisions of amended art. 2323.
[19] By Act No. 3 of the 1996 First Extraordinary Session, effective April 16, 1996, the legislature amended La.Civ.Code art. 2324 so that it currently provides in relevant part:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's ... immunity as provided in R.S. 23:1032....
We conclude this amendment is a substantive change in the law in that it creates, confers, defines, destroys, or otherwise regulates rights, liabilities, causes of action, or legal duties, and therefore, applies prospectively only. See Rollette v. State Farm Mutual Automobile Insurance Company, 619 So.2d 832, 835 (La.App. 1st Cir. 1993). As such, we do not apply it to this case.
[20] La.C.C.P. art. 1812(C) provides:

In cases to recover damages for injury, death, or loss, the court may submit to the jury special written questions inquiring as to:
* * * * * *
(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
[21] Cf. LeBlanc v. Continental Grain Co., Inc., 95-813, p. 13 (La.App. 5th Cir. 3/13/96); 672 So.2d 951, wherein the court concluded the jury's quantification of a direct employer's fault in accordance with Gauthier was error and conducted a de novo review.
[22] Safway asserts it was prejudiced by the charging of the jury after the trial court determined the answers and the verdict were inconsistent. Safway urges when the trial judge instructed, "You [jury] answered `yes.' Okay? But then you went from that, you allocated 15 percent of the damages to Safway ...," the jury believed if Safway were found liable, it would only be responsible for fifteen percent of the damages. The gist of Safway's argument is that in light of Cavalier, overruling the Gauthier mandate of jury quantification of employer fault, the jury was misled. Safway urges this reference tainted the entire verdict and a remand for a new trial is warranted.

Viewing all the instructions presented to the jury, we are convinced the trial judge's remark was merely a clarification of the inconsistency in the jury's answers. The trial judge's sole reference to the jury of it having "allocated 15 percent of the damages to Safway," when read in conjunction with the other instructions, does not charge the jury that its assessment of fault will result in a judgment casting Safway for fifteen percent of the damages. Accordingly, we find Safeway was not so prejudiced by the instructions as to warrant either a new trial or interdiction of the final verdict.
[23] Because we cannot discern whether Shell adopted all of Safway's argument on quantum or only as much as applies to those items of damage Shell referenced particularly, our discussion on quantum presumes Shell has raised on appeal all items of damage briefed by Safway.